**KELLOGG COMPANY, a Corporation,**

v.

**The UNITED STATES.**

**KELLOGG SALES COMPANY,**
a Corporation,

v.

**The UNITED STATES.**

Nos. 106–54, 107–54.

United States Court of Claims.

July 12, 1955.

Herbert Morton, Chicago, Ill., for the plaintiffs.

Benjamin H. Pester, Washington, D. C., with whom was Asst. Atty. Gen., H. Brian Holland, for the defendant, Andrew D. Sharpe and Edmund C. Grainger, Jr., Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

The issue in these consolidated cases is whether under section 3475(a) of the Internal Revenue Code of 1939, as amended, 26 U.S.C.A. § 3475(a), the plaintiffs were properly required to pay transportation taxes on shipments of property entirely within the United States, in instances where it is shown that checks to cover the transportation charges were physically delivered to the transportation companies at Windsor, Canada, outside of the United States. The pertinent part of the applicable statute is as follows:

"There shall be imposed upon the amount paid within the United States after the effective date of this section for the transportation, on or after such effective date, of property by rail, motor vehicle, water, or air from one point in the United States to another, a tax equal to 3 per centum of the amount so paid, except that, in the case of coal, the rate of tax shall be 4 cents per short ton. * * * In the case of property transported from a point without the United States to a point within the United States the tax shall apply to the amount paid within the United States for that part of the transportation which takes place within the

United States. The tax on the transportation of coal shall not apply to the transportation of coal with respect to which there has been a previous taxable transportation."

The issue arises in the following way: during the period from July 1, 1950, to October 30, 1950, freight charges were incurred by the plaintiffs on shipments of raw material, merchandise and other property transported on lines of The New York Central and Grand Trunk Western Railroad Companies from one point to another in continental United States. In payment of the freight charges the plaintiffs procured cashier's checks issued by the Michigan National Bank at Battle Creek, Michigan, payable to the Kellogg Company. These checks were endorsed at the Kellogg Company offices at Battle Creek, Michigan, as follows:

"Pay to the order of The New York Central Railroad [or the Grand Trunk Western Railroad Company],
"Kellogg Company,
"By E. O. Orchard,
"*Treasurer*."

Other similar checks were made payable to Kellogg Sales Company and similarly endorsed by that company. The Kellogg Sales Company was located at Detroit, Michigan, and was wholly owned by the Kellogg Company.

The freight bills comprising the total charges were listed in letters prepared in duplicate, addressed to The New York Central Railroad or the Grand Trunk Western Railroad Company, as the case might be, in Windsor, Canada. Each letter containing a list of freight charges, together with freight bills and a check, was transmitted by mail from Battle Creek to the office of Kellogg Sales Company in Detroit, Michigan. Upon arrival at the Detroit office the letters, freight bills and checks were transported by Kathryn H. Wautelet by automobile to Windsor, Canada, and there delivered by her to the agent of the respective carriers. The agent acknowledged receipt of the endorsed cashier's checks in Windsor by signing a receipt at the end of a duplicate copy of the letter and delivering the copy to Miss Wautelet.

Kathryn H. Wautelet was employed by the Kellogg Company on July 31, 1950, and until October 31, 1950, expressly for the purpose of transporting and delivering the documents described above to the carriers at Windsor, Canada, for the taxpayer. She received a salary of $15 per week. She remained with the company from October 31 until December 31, 1950, performing minor clerical duties during the latter period. Her employment was terminated on December 31, 1950.

The plaintiffs concede that the payments were made in this manner to avoid the payment of the tax then imposed by section 3475(a).

The railroads insisted upon collecting the transportation tax which was paid by the plaintiffs under protest. Timely claims for refund were filed by the plaintiffs with the Commissioner of Internal Revenue. The plaintiffs here seek a recovery of the taxes which they claim were illegally collected from them. The issue turns upon the proper construction and application of the taxing statute.

The plaintiffs insist that since the statute imposes the tax on the amount paid within the United States, the delivery of the checks to agents of the transportation companies just beyond the borders of the United States renders the tax inapplicable, and therefore it should not have been collected.

We think when the statute is read as a whole and in its proper setting it becomes manifest that it was the intention of the Congress to levy the transportation tax on shipments wholly within continental United States.

In construing the 1939 statute the Commissioner of Internal Revenue in 1942 issued a press release stating that the tax did not apply to amounts paid outside the United States, regardless of where the transportation occurred. However, on July 7, 1950, the Commissioner of Internal Revenue issued a re-

lease in reference to the tax on transportation stating "there is no doubt that Congress intended to include all domestic shipments where all the transactions in connection with shipments of goods normally take place within the United States."

Effective November 1, 1950, the Congress amended section 3475(a) of the act of 1939 to make clearer the terms of the 1939 act in respect to the tax on transportation charges.

In the report of the Senate Finance Committee on the Revenue Act of 1950, dealing with this particular provision, it states that its attention has been called to the fact that an increasing number of persons have been seeking to avoid the tax by various devices to pay the transportation charges outside of the United States. It quotes the press release which the Commissioner issued on July 7, 1950, to the effect that there is no doubt that Congress intended to tax all domestic shipments. The committee then makes this statement:

"While there has been considerable dispute as to the correctness of these interpretations of the law by the Commissioner it is your committee's view that these rulings are an accurate interpretation of existing law. * * *"

The Senate report also contains this statement:

"To clarify the application of these taxes section 607 of your committee's bill adds provisions to the sections of the Internal Revenue Code imposing the taxes on transportation of persons and property (secs. 3469 and 3475) indicating that where the transportation both begins and ends in the United States, the taxes apply even though payment is made outside the United States. While the resulting increase over present collections under these taxes will be small, your committee's action forestalls the possibility of a substantial revenue loss in the future."

The Senate Committee Report then reiterates that the Commissioner of Internal Revenue had properly interpreted the intent of the Congress to impose a tax on transportation within the United States under the existing law and then states "the amendments are merely declaratory of existing law."

While the amendments were made effective after these particular shipments, we think it is the proper construction that the Congress intended by the original act to tax transportation within the United States of shipments of this character. To construe it otherwise would have led to the absurd result of inviting the escape from all such taxes by the simple device of carrying a check across the border and delivering it to an agent of the transportation company.

If a technical construction is to be invoked, there is serious doubt as to whether payment was actually made in Canada in these cases. The cashier's checks were issued within the United States; they were drawn on a bank within the United States; they were endorsed to the transportation companies within the United States. The checks were then delivered, with the transportation bills and an accompanying letter, by a person employed for the express purpose of taking the papers just across the border and securing a receipt for the checks. The checks were no doubt deposited and immediately came back to the issuing bank for final payment. A check is merely an order on someone to transfer funds and a cashier's check is merely a guaranteed order. Neither is of any value except as it calls for the payment of funds. We have not the least doubt that if the bank upon which they were drawn had for any reason failed the transportation companies would have sued and recovered from the plaintiffs as the primary obligors and endorsers of the checks in question. Cincinnati Oyster & Fish Co. v. National Lafayette Bank, 51 Ohio St. 106, 36 N.E. 833, 46 Am.Stat.Rep. 560. "In the absence of circumstances indicating a contrary intention a cashier's check accepted from

a debtor is not an absolute but merely a conditional payment, defeasible on non-payment or dishonor." 40 Am.Jur. p. 768, sec. 77.

We doubt whether there is a single person who believes that Congress intended to exempt a man who walked across the border to deliver his check and at the same time to tax his neighbor who received the same service between the same points in this country, and who paid where the service was rendered without any attempt to avoid the tax. Legislation must be construed in its setting. At the time of its enactment Canada had a law which taxed transportation in that country, similarly. Congress, manifestly, instead of granting any exemption intended to close the gap and tax all transportation between points wholly within the United States. Evidently no thought was given to the possibility of a repeal of the Canadian tax and consequently no thought was given to the single phrase which plaintiff has undertaken to lift out of its context and construe as if it were the whole law.

Everyone admits, as it must be admitted, that Congress had no intention of granting such an exemption. There was, there is, no doubt that Congress intended to tax all transportation between points wholly within the United States.

We think that the method used was primarily a dodge for the manifest purpose of avoiding payment of a tax that was properly due. There is a degree of cleverness in the method. One is reminded of the Mother Goose rhyme of Little Jack Horner who, in eating his Christmas pie, "put in his thumb, pulled out a plum, and said * * * 'What a good boy am I.'"

I remember that even as a boy I was not sure that in doing this stunt Jack showed himself to be especially good. He had a motive. It was Christmastime. He could not afford not to be good.

In a disarming way the plaintiffs concede that their sole purpose was to avoid the payment of the taxes which would otherwise have been due. This is to their credit, although it would be difficult in any event to reach any other conclusion. It at least makes the issue clear and avoids the necessity of trying to see through a veil of subterfuge the truth about the whole matter, as courts are sometimes called upon to do. There was no thought or suggestion of subterfuge here, but an engaging frankness which is truly commendable.

We think for the reasons we have set out and which we regard as good and sufficient, the tax should have been collected and the plaintiffs should not recover.

The petition is dismissed.

LITTLETON, Judge, concurs.

WHITAKER, Judge (concurring).

I concur on the ground that payment was made within the United States.

LARAMORE, Judge (dissenting).

I respectfully dissent for the following reasons:

The terms of the statute under which the taxes were collected from plaintiffs are clear and unambiguous. When Congress used the words "there shall be imposed upon the amount paid within the United States * * *," it is susceptible of only one meaning. In the absence of ambiguity, courts cannot go behind the act in order to give it another and different meaning. The interpretive ruling of the Commissioner, dated December 7, 1942, wherein he stated:

"The tax does not apply to the amount paid for the transportation of property * * * (c) when paid outside the United States, regardless of where the transportation occurs; [1]"

was consistent with the regulations promulgated by the Commissioner in 1943. The pertinent portions of such regulations are as follows:

"Reg. 113, Sec. 143.11. *Scope of Tax.*—Section 3475(a) imposes a

I. Mim. 5447, December 7, 1942, 1942–2 Cumulative Bulletin 280.

tax *upon amounts paid within the United States* after December 1, 1942, to a person engaged in the business of transporting property for hire, for transportation, originating on or after such date, of property by rail, motor vehicle, water, or air from one point in the United States to another.

"Reg. 113, Sec. 143.13. *Application of Tax.* \* \* \* The tax applies to the total *amount paid within the United States* for transportation of property from one point in the United States to another even though while enroute part of the transportation movement is through a foreign country."

The Commissioner's regulations, adopted to conform with the 1950 amendment of the taxing statute, expressly recognized that the tax applies to amounts paid without the United States only on and after November 1, 1950, the effective date of the 1950 amendment. These regulations provide as follows:

"*Scope of Tax.* Section 3475(a) imposes a tax upon (a) amounts *paid within* the United States after December 1, 1942, for transportation originating on or after such date, of property by rail, motor vehicle, water, or air from one point in the United States to another, and (b) amounts paid *without* the United States, *on or after November 1, 1950,* for transportation originating on or after such date; of property by rail, motor vehicle, water, or air from one point in the United States to another. The tax applies only to amounts paid to a person engaged in the business of transporting property for hire. [1951–1 Cum.Bull. 148, 149.]

\* \* \* \* \* \*

"With respect to amounts paid within the United States, the tax applies only to amounts paid after December 1, 1942, for transportation which originated on or after such date. \* \* \*

"With respect to amounts *paid without* the United States, the tax applies to amounts paid on or after November 1, 1950, for transportation originating on or after that date."

The Supreme Court, in the case of Gould v. Gould, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211, said:

"In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out."

In a more recent case of United States v. Olympic Radio and Television, Inc., 1955, 349 U.S. 232, 75 S.Ct. 733, 736, the Supreme Court said: " \* \* \* We can only take the Code as we find it and give it as great an internal symmetry and consistency as its words permit."

Why Congress employed the words "paid within the United States," we do not know. It may have been because Canada also had a similar tax until 1949 when it was repealed. While the Canadian tax was in effect, there could have been no tax avoidance reason for a shipper of merchandise within the United States to physically pay the transportation cost in Canada. Upon repeal of the Canadian tax, it became possible for shippers to avoid the United States excise tax by payment in Canada. Congress recognized this loophole and closed it shortly thereafter by amending this statute.

The physical delivery of the cashiers' checks was clearly payment without the United States within the meaning of section 3475(a) of the Internal Revenue Code.

I would permit plaintiffs to recover.

MADDEN, Judge, joins in the foregoing dissent.