**FISHER FLOURING MILLS COMPANY,**
a corporation, Appellant,

v.

**UNITED STATES of America,**
Appellee.

**No. 15819.**

United States Court of Appeals
Ninth Circuit.

Oct. 6, 1958.

On Rehearing En Banc June 30, 1959.

Graham, Green & Dunn, William R. Smith, Benjamin J. Gantt, Jr., Seattle, Wash., for appellant.

Charles K. Rice, Asst. Atty. Gen., Carolyn R. Just, Helen A. Buckley, Lee A. Jackson, I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., Charles P. Moriarty, U. S. Atty., Seattle, Wash., for appellee.

Before HEALY, FEE and HAMLIN, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

Congress, in 1942, imposed an excise tax equal to three per cent of the amount so paid "upon the *amount paid within the United States* * * * for the transportation * * * of property by rail." [1] This tax was effective December 1, 1942, and remained in force under the quoted language until the statute was amended September 23, 1950, whereby, effective as to transportation originating on or after November 1, 1950, Congress imposed an excise tax "equal to 3 per centum of the amount so paid" "*upon the amount paid within or without the United States for the transportation* * * * *by rail.*" [2]

■ Fisher Flouring Mills, a shipper who had paid as tax the three per centum of amounts paid in Canada for trans- portation of property by rail before November 1, 1950, brought suit for refund. The District Court denied recovery.

This judgment must be and is reversed.

The transportation of property by rail was all performed from one point in the United States to another point in the United States. No tax was levied upon transportation, but upon "amounts paid within the United States." The language of the statute of 1942 is clear and concise. There is no ambiguity. When Fisher paid amounts in Canada for transportation of property, it did not perform a taxable act.

■ It is hornbook law that, where Congress has amended a statute to cover a "loophole," the fact that an addition has been required is proof that the prior statute should be given a different construction. [3] Furthermore, in 1950, Congress, by imposing a tax upon amounts paid *within or without* the United States, expressly limited the broader scope of the amended statute to transportation originating on or after November 1, 1950. Congress could have made this tax retroactive to July 7, 1950, had that been desired. [4]

■ The only possible application of the tax imposed in the first Act is to

1. Emphasis added in the excerpt. The full text reads:

   "(a) Tax.—There shall be imposed upon the amount paid within the United States after the effective date of this section for the transportation, on or after such effective date, of property by rail, motor vehicle, water, or air from one point in the United States to another, a tax equal to 3 per centum of the amount so paid, except that, in the case of coal, the rate of tax shall be 4 cents per short ton. * * * In the case of property transported from a point without the United States to a point within the United States the tax shall apply to the amount paid within the United States for that part of the transportation which takes place within the United States. * * *" Internal Revenue Code of 1939, § 3475 (as added to by § 620(a), Revenue Act of 1942, c. 619, 56 Stat. 798), 26 U.S.C.A. § 3475.

2. Emphasis added in the excerpt. The full text reads:

   "(a) Tax. There shall be imposed upon the amount paid within or without the United States for the transportation of property by rail, motor vehicle, water, or air from one point in the United States to another, a tax equal to 3 per centum of the amount so paid * * *." Internal Revenue Code of 1939, § 3475 (as amended by § 607(b) of the Revenue Act of 1950, c. 994, 64 Stat. 906).

3. United States v. McClure, 305 U.S. 472, 59 S.Ct. 335, 83 L.Ed. 296; United States v. Bashaw, 152 U.S. 436, 14 S.Ct. 638, 38 L.Ed. 505.

4. Lynch v. Hornby, 247 U.S. 339, 38 S.Ct. 543, 62 L.Ed. 1149; Welch v. Henry, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87; Milliken v. United States, 283 U.S. 15, 21, 51 S.Ct. 324, 75 L.Ed. 809.

payments made in the United States. The fact that the transportation of goods was wholly within the United States is immaterial. This is a new tax not previously imposed.[5] The Congress has a wide range in imposition of excise taxes. The history of such legislation will show that the selection has been in many cases discriminatory. The factors and influences which impel choices of one article instead of another or the choices of conditions in which an article is taxed are not a subject for judicial examination. Congress has often imposed such discriminatory taxes in order to turn economic currents. If an excise tax were imposed upon the sale of black cattle, everyone would buy white cattle. In buying a white cow, the purchaser is not dodging a tax. He is simply engaging in a transaction which Congress has not seen fit to tax. A striking example of a highly selective tax imposed upon an identical article under certain conditions and not under others was the prohibitory excise placed at one time upon *colored*[6] oleomargarine but not upon uncolored. This was highly discriminatory and was deliberately done to prevent the sale of oleomargarine colored to resemble butter. It would have been argued nevertheless that those who chose to sell oleomargarine uncolored were taking advantage of a loophole in the law. It could have been argued that every producer might also sell his oleomargarine uncolored and thereby escape the burdensome taxation. Congress imposed the tax and also provided a loophole available to all taxpayers to escape the tax imposed.

If speculation were to be indulged in, plausible reasons might be found for imposition of the tax so conditioned that amounts paid in Canada would not be covered. World War II was in the offing when the tax statute was passed, and our entry therein was made almost a year before this tax became effective, on December 1, 1942. Canada then imposed a tax upon the transportation of persons. The way was left open for the taxation in Canada of amounts paid there for transportation in the United States or for a tax on funds transferred into Canada from the United States. The statute shows great care was taken that, where goods were transported from a point in Canada to a point in the United States, no amounts paid in Canada for such transportation in the United States should be taxed. The policy is obvious. But why this exclusion is any less discriminatory than the one presented before us is not clear. Indeed, the same policy seems to dictate both exclusions. It is a matter of history that, when Canada repealed its tax on the transportation of persons, residents of the United States flocked to the Canadian border cities to buy transportation across the United States, paying for the tickets in Canada. Undoubtedly, everyone in the United States could have done so. The results were highly discriminatory. Is an attempt to be made to recapture taxes on all such transactions?

The economic considerations no longer prevail, and the policy has changed. The statute remained in force and effect until Congress amended or repealed the

---

5. There were, however, precedents which Congress might have followed, in which the intention to tax the amounts paid for transportation, wherever the payments might have been made, is apparent. "That from and after the first day of November, nineteen hundred and seventeen, there shall be levied, assessed, collected, and paid (a) a tax equivalent to three per centum of the amount paid for the transportation * * * of property by freight consigned from one point in the

United States to another * * *." Revenue Act of 1917, § 500, 40 Stat. 314. Congress disregarded this precedent and imposed a tax only upon amounts paid in the United States by the statute of 1942. The act was deliberate. The intention to tax amounts paid in the United States alone seems incontrovertible.

6. McCray v. United States, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78.

law. The construction is not dependent upon policy changes.

The statute which sets the terms and conditions upon which a tax was laid, effective December 1, 1942, upon amounts paid in the United States for transportation of goods by rail is plain, concise and definitive. It is not ambiguous. The enactment is consistent with itself. No provision thereof is in discord with the clauses above quoted. The suggestion that one portion of an act should not be construed to annul or destroy what has clearly been granted by another has no applicability here. The Act is internally cohesive. There is no room for interpretation or construction. The clear language of the enactment cannot be destroyed or abrogated because the judges think the results are improvident or impolitic. The courts have no such mandate.

■ The main contention of the government seems to be that Fisher and others similarly situated took advantage of the clear language of the statute, which gave to each of them an unexpected windfall. The Supreme Court of the United States has recently made it clear that, although a taxpayer receives a benefit which he had not expected, by favorable construction of an ambiguous statute he should not be deprived thereof even though there was an unexpected windfall.

"But the rule that general equitable considerations do not control the measure of deductions or tax benefits cuts both ways. It is as applicable to the Government as to the taxpayer. Congress may be strict or lavish in its allowance of deductions or tax benefits. The formula it writes may be arbitrary and harsh in its applications. But where the benefit claimed by the taxpayer is fairly within the statutory language and the construction sought is in harmony with the statute as an organic whole, the benefits will not be withheld from the taxpayer though they represent an unexpected windfall." Lewyt Corporation v. Commissioner of Internal Revenue, 349 U.S. 237, 240, 75 S.Ct. 736, 739, 99 L.Ed. 1029.

The dissenting opinion, while it does disagree with the majority as to the construction of the particular clause, accepts the idea implicit in the majority opinion that a taxpayer given an unexpected benefit by the clear language of an enactment is entitled as of right to keep it.

"Either of these positions can be supported by arguments based solely upon the literal language of the statute. Here we are not compelled in our choice by austere regard for what Congress has written, undistorted or unmitigated by judicial rewriting, no matter what the consequences in a specific case. Where the taxing measure is clear, of course, there is no place for loose conceptions about the 'equity of the statute'. Revenue laws are notoriously not expressions of an ordered system of reason and fairness. There has probably never been a revenue statute which, by design or oversight, has not favored some groups and laid the basis for a claim of unfairness to others similarly situated. But while one should sail close to the shore of literalness in dealing with the technical problems which are the subject matter of revenue laws, literalness of meaning affixed merely to a particular word or phrase may itself distort what the provision as an entirety and in context conveys and therefore commands." Lewyt Corporation v. Commissioner of Internal Revenue, 349 U.S. 237, 249, 75 S.Ct. 736, 744, 99 L. Ed. 1029.

■ In the light of this current authority, it seems clear that the Supreme Court has not abandoned the axiom that the legislative will must be ascertained from the text of the statute if the words are clear and plain and the whole enactment internally cohesive. In Addison v. Holly Hill Fruit Products, 322 U.S. 607,

617, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488, it is said:

"Legislation introducing a new system is at best empirical, and not infrequently administration reveals gaps or inadequacies of one sort or another that may call for amendatory legislation. But it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive. 'The natural meaning of words cannot be displaced by references to difficulties in administration'."

In virtue of legislative selectivity of objects of taxation, an act levying imposts should not be construed if unambiguous even by the use of adventitious aids ordinarily available. A reference to older cases which crystallize this principle may thus be profitable.

Helvering v. City Bank Farmers Trust Co., 296 U.S. 85, 89, 56 S.Ct. 70, 72, 80 L.Ed. 62, in emphatic language, expresses this limitation:

"We are not at liberty to construe language so plain as to need no construction, or to refer to committee reports where there can be no doubt of the meaning of the words used."

In view of the lucid declaration of the Act before us in a field where the will of Congress is paramount, judicial self-restraint might well lead us to refrain from construction, however beneficently intended.

In Van Camp & Sons Co. v. American Can Co., 278 U.S. 245, 253, 49 S.Ct. 112, 113, 73 L.Ed. 311, it is said:

"In support of this contention [that plain words of a statute be disregarded in order to carry out attractive policy], we are asked to consider reports of congressional committees and other familiar aids to statutory construction. But the general rule that 'the province of construction lies wholly within the domain of ambiguity,' * * * is too firmly established by the numerous decisions of this court either to require or permit us to do so. The words being clear, they are decisive. There is nothing to construe."

This rule is stated as of universal application and has never been openly disregarded in the federal courts,[7] where the language is clear and there is no internal contradiction in the enactment, as is the case here. This Court has applied the rule of these authorities:

"The intention of the Congress is to be sought for primarily in the language used, and where this expresses an intention reasonably intelligible and plain it must be accepted without modification by resort to construction or conjecture." Gorin v. United States, 9 Cir., 111 F.2d 712, 719 (quoting with approval from Thompson v. United States, 246 U.S. 547, 551, 38 S.Ct. 349, 62 L.Ed. 876).

---

**7.** Of course, we must all beware of absolutes in the field of constitutional and legislative interpretation. The language of some of the cited cases sounds inflexible. It is not held here that such construction should "never" be applied to an unambiguous statute, only "hardly ever," as "Pinafore" lyrically puts it. Certainly not in this case. Nevertheless, the authorities are implacable. Hamilton v. Rathbone, 175 U.S. 414, 419, 420, 421, 20 S.Ct. 155, 44 L.Ed. 219; Pennsylvania Railroad Co. v. International Coal Mining Co., 230 U.S. 184, 190, 33 S.Ct. 893, 57 L.Ed. 1446; MacKenzie v. Hare, 239 U.S. 299, 307, 308, 36 S.Ct. 106, 60 L.Ed.

297; Railroad Commission of State of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 588, 589, 42 S.Ct. 232, 66 L. Ed. 371; Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356, 42 S.Ct. 360, 66 L.Ed. 653; United States v. Missouri Pacific R. Co., 278 U.S. 269, 277, 278, 49 S.Ct. 133, 73 L.Ed. 322; Wilbur v. United States ex rel. Vindicator Consol. Gold Mining Co., 284 U.S. 231, 237, 52 S.Ct. 113, 76 L.Ed. 261; United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 83, 84, 53 S.Ct. 42, 77 L.Ed. 175; Ex parte Collett, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207.

■ Therefore, the instant statute, which unmistakably imposed a tax upon money paid in the United States for transportation in the United States, should not be construed as a tax imposed on amounts paid without the United States for such transportation. As noted before, the impact of the tax falls on the "amounts paid within the United States" and not on the transportation itself. Distinctions of this type are familiar in taxing statutes. Even if it be said that the omission of the words "and without" is a palpable error and that the phrase should have read "amounts paid within and without the United States," this Court can give no remedy. "To supply omissions transcends the judicial function." Iselin v. United States, 270 U.S. 245, 250, 251, 46 S.Ct. 248, 251, 70 L.Ed. 566. But, as we have before noted, language of the entire statute is not only compatible with the plain language of this sentence when read in isolation, but compels the conclusion that the omission of these words was deliberate. The result of reading the sentence is sound common sense. It does not frustrate, but patently carries out the purpose of the whole statute. The consequences now claimed to be adverse to present policy do not certainly produce an absurdity "so gross as to shock the general moral or common sense."[8] If this Court is ever compelled "to find justification for wrenching from the words of a statute a meaning" which literally they do not bear, at least the exact wording should be otherwise inexplicable and meaningless.

Even if an attempt were made irrespective of the prevailing doctrine to gain light from legislative history, it would be of no avail. There is no interpretative material in the committee reports of the Congress which passed the Act under consideration. The naked words of the statute then control.

It is the contention of the government that the statute ought not to be construed to provide for its own self-nullification. It has been pointed out that the words are plain and that each portion of the enactment is consistent with every other portion. Then the supposedly decisive argument is made that the results of a literal reading are incongruous.

"Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter. * * * It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd, or otherwise objectionable. But in such case the remedy lies with the lawmaking authority, and not with the courts." Crooks v. Harrelson, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156.

In a desperate rear guard defense to almost overwhelming precedent, the government appeals to departmental and committee construction promulgated over seven and one-half years after the adoption by Congress of the Act here to be construed.

■ It is true the Treasury issued a new bulletin on July 7, 1950, reversing the previous interpretation and advancing for the first time the arguments now made by the government. If it were possible for an administrative agency to re-

8. Crooks v. Harrelson, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156.

interpret statutory language to fit current policy, a new method of amending Acts passed by Congress has been discovered. It is freely agreed that the machinery of government could not operate without daily administrative interpretations and rulings which properly control every phase thereof. But there are at least two reasonable limitations on this beneficent power. First, the rulings cannot contradict the clear language of a coherent and unambiguous statute.[9] Second, if the rulings over a period of time are consistent in interpretation of a particular phrase or clause, these cannot be reversed unless there is a change by congressional amendment of the statute.[10]

The argument that a congressional committee said that the interpretation of the Treasury Department of July 7, 1950, stated existing law [11] is not proper for our consideration. A report of a committee of the 77th Congress, which passed the statute, might, under certain circumstances, have been considered, but this doctrine does not by any manner permit the contemplation of a committee report of the 81st Congress, meeting in 1950, when viewing the tax imposed in December, 1942. The latter may be regarded as an attempt at judicial construction of the statute.

For all the bulletin of July 7, 1950, and the apparent acceptance by the Congressional Committee, Congress did amend the statute by including the words in question. As above noted, the phrase now reads:

"There shall be imposed upon the amount paid within or without the United States * * *."

The legislative body thus expressly covered the supposed "loophole." The inference to be drawn is that the previous statute, effective December 1, 1942, did not impose a tax on amounts paid *without* the United States on transportation of property by rail within the United States.

9. Bingham's Trust v. Commissioner, 325 U.S. 365, 377, 65 S.Ct. 1232, 89 L.Ed. 1670; Social Security Board v. Nierotko, 327 U.S. 358, 361, 66 S.Ct. 637, 90 L.Ed. 718; Kaufman v. United States, 4 Cir., 131 F.2d 854; Helvering v. Edison Brothers Stores, 8 Cir., 133 F.2d 575.

10. "In Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796, Mr. Justice Cardozo said: 'administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful. * * *' Against the Treasury's prior longstanding and consistent administrative interpretation its more recent ad hoc contention as to how the statute should be construed cannot stand." United States v. Leslie Salt Co., 350 U.S. 383, 396, 76 S. Ct. 416, 424, 100 L.Ed. 441. There was a contemporaneous recognition of the controlling character of the wording of the statute itself in Mim. 5447, 1942-2, Cum.Bull., p. 280. The pertinent part reads: "6. The tax does not apply to the amount paid for the transportation of property: * * * (c) When paid outside the United States, regardless of where the transportation occurs * * *." This acceptance of the words in literal sense continued:

11. "In a release on July 7, 1950, the Commissioner states that in the case of the tax on the transportation of property— 'there is no doubt that Congress intended to include all domestic shipments where all the transactions in connection with shipments of goods normally take place within the United States'.

"While there has been considerable dispute as to the correctness of these interpretations of the law by the Commissioner it is your committee's view that these rulings are an accurate interpretation of existing law * * *." Senate Report No. 2375, 81st Congress, 2d Session, p. 25. Similar language is contained in the section of the Report dealing with the various amendments made by the Act. Senate Report No. 2375, 81st Congress, 2d Session, p. 579.

"It is the opinion of the Bureau, that if a bona fide employee of the actual shipper * * * goes to Canada in person and there makes payment for the transportation of property, the tax will not be owing on account of such payment in Canada." Letter Ruling, Office of the Commissioner of Internal Revenue to the Northwest Fish Traffic Commission, April 11, 1950. Another Letter Ruling, as late as June 28, 1950, to The National Industrial Traffic League, repeated the ruling in essentially the same words.

But Congress went further to make the intent clear, notwithstanding the language of the committee report. The tax was not made retroactive to July 7, 1950. The Congress did not amend the statute to place a legislative construction on the language. This might have been done by a sentence as follows:

"The words 'amounts paid within the United States' shall not be construed to exempt transportation wholly within the United States from taxation."

The tax was not made effective on September 23, 1950, the date of the passage of the statute, but the operation of the tax was postponed until November 1, 1950. The Treasury Department issued a regulation which accepted this postponement of the effective date and thereby in effect acquiesced in the fact that the existing law was changed.[12] If payments without the United States were already taxed, there could have been no purpose in postponing the effective date of the amendment which clearly taxed such amounts.

From December 1, 1942, for approximately seven and one-half years, the Department of the Treasury and the Bureau of Internal Revenue issued interpretations of the statutory language in accordance with the present contentions of Fisher. Such early constructions indicate that the language was plain and unambiguous, and are thus not only highly persuasive, but under these circumstances conclusive.

"Against the Treasury's prior longstanding and consistent administrative interpretation its more recent ad hoc contention as to how the statute should be construed cannot stand." [13]

The amounts here, with minor exceptions, were paid in Canada by drafts upon Canadian banks. These Canadian bank drafts were manually delivered in Canada. These were drawn on a Canadian bank and payable in Vancouver, B. C. These were presented for final payment and paid in Vancouver, B. C. As to such payments, the opinions in Kellogg Co. v. United States, 133 F.Supp. 387, 132 Ct. Cl. 507, might be readily distinguished. We do not draw the distinction, for we believe the majority opinions are wrong upon that point as well as the points with which we have already dealt.

Reversed.

12. On January 18, 1951, Part 143 of Regulations 113 was amended by the Commissioner of Internal Revenue so as to reflect the extended application of I.R.C. § 3475(a), as amended:
"*Section 143.11. Scope of tax*
"Section 3475(a) imposes a tax upon (a) amounts paid within the United States after December 1, 1942, for transportation originating on or after such date, of property by rail, motor vehicle, water, or air from one point in the United States to another, and (b) *amounts paid without the United States, on or after November 1, 1950, for transportation, originating on or after such date,* of property by rail, motor vehicle, water, or air from one point in the United States to another. The tax applies only to amounts paid to a person engaged in the business of transporting property for hire.
"*Section 143.12. Rate of tax*
\* \* \* \* \*

"*Section 143.13. Application of tax*
"(a) *In general* (1) \* \* \*
"(2) \* \* \*
"(3) \* \* \*
"(4) With respect to *amounts paid within the United States,* the tax applies only to amounts paid after December 1, 1942, for transportation which originated on or after that date. No tax attaches to payments for transportation originating prior to the first moment of December 1, 1942. Payments made prior to December 2, 1942, are not taxable regardless of when the transportation occurs.
"*With respect to amounts paid without the United States, the tax applies to amounts paid on or after November 1, 1950, for transportation originating on or after that date.*" (Emphasis added.)

13. United States v. Leslie Salt Co., 350 U.S. 383, 396, 76 S.Ct. 416, 424, 100 L.Ed. 441.

Upon Rehearing by the full Court
En Banc

Before POPE, Chief Judge, and STE-
PHENS, FEE, CHAMBERS, BARNES,
HAMLEY, HAMLIN and JERTBERG,
Circuit Judges.

PER CURIAM.

The above opinion is adopted as the
opinion of the Court.

Reversed.