JAMES N. FEICHTINGER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 26756–81 "R."    Filed January 20, 1983.

*Kenneth S. Klayman*, for the petitioner.
*Samuel E. Berger*, for the respondent.

## OPINION

COHEN, *Judge*: Petitioner is the plan administrator of the Consultants & Actuaries, Inc. Defined Benefit Pension Plan

---

presented no evidence with respect to the addition and merely alleged that it must have been arbitrarily determined.

and brings this action for a declaratory judgment pursuant to section 7476 and Rule 211.[1]

This case was submitted to the Court without trial under Rule 122, and the parties have agreed that all jurisdictional requirements have been met. See sec. 7476(b) and Rule 210(c). The Consultants & Actuaries, Inc. Defined Benefit Pension Plan (the plan) was adopted on March 16, 1979, and a request for determination with respect to the qualified status of the plan was filed with the District Director of Internal Revenue at Los Angeles, Calif. After several amendments not material to the present action, on October 8, 1981, a final adverse determination letter was issued with respect to the plan. Petitioner challenges that adverse determination and the regulations relied upon by respondent in making the determination.

The question to be decided is whether a trust described in, and qualified for special tax treatment by, section 401 (and section 501) may be created as part of a plan which provides that projected cost-of-living increases in the dollar limitation on benefits under section 415(d)(1)(A) may be taken into account by an actuary in determining the funding requirements of a plan prior to the effective date of such increase. In other words, must the language of the plan preclude anticipation of cost-of-living increases as a basis for the actuarial assumptions by which a current year's contributions are determined?

This case is apparently one of first impression. The number of plans to which the question may be significant, however, is limited in the future by express provisions of section 235(f) of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97–248, 96 Stat. 507, discussed *infra*.

Petitioner relies on two major premises in arguing that the adverse determination is erroneous and the regulations on which it is based are invalid: First, according to petitioner, disqualification is predicated upon funding or deductibility questions, which are not a proper basis for advance ruling on the qualification of a plan. Second, he asserts, even if the

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the year here in issue. All references to Rules are to the Tax Court Rules of Practice and Procedure.

objections to the plan raised by respondent are legitimate qualification issues, for years prior to the effective dates of TEFRA, there should be no prohibition on current funding of a defined benefit pension plan for the actuarially projected maximum benefit at the time of retirement, including funding of anticipated cost-of-living increases.

## I. Relationship of Funding, Deduction, and Benefit Limitations to Initial Qualification

Section 401(a) lists various requirements that must be met by a trust forming part of a pension plan in order for such trust to be eligible for favored tax treatment under various sections of the Internal Revenue Code. Section 401(a)(16) provides that:

A trust shall not constitute a qualified trust under this section if the plan of which such trust is a part provides for benefits or contributions which exceed the limitations of section 415.

Section 415(a)(1)(A) provides that a trust which is part of a pension plan will not constitute a qualified trust under section 401(a) if, in the case of a defined benefit plan, the plan provides for the payment of benefits exceeding limitations set forth in section 415(b)(1). The applicable limitation of section 415(b)(1) as originally adopted was the lesser of $75,000 or 100 percent of a participant's average compensation for the 3 consecutive calendar years during which the participant had the greatest compensation. The $75,000 limitation, however, was to be adjusted annually, under section 415(d)(1), for increases in the cost of living "in accordance with regulations prescribed by the Secretary." As of 1979, the adjusted maximum dollar limitation was $98,100.

On December 30, 1980, the Secretary of the Treasury filed final regulations concerning section 415 in T.D. 7748, published at 46 Fed. Reg. 1687 (Jan. 7, 1981). These regulations are generally effective for plan years beginning after 1975 and for limitation years ending with or within plan years beginning after 1975.[2] For plan years and limitation years through

---

[2]Absent special election, the "limitation year" is the calendar year. Sec. 1.415–2(b), Income Tax Regs. In this case, both the plan year and the limitation year were set forth in the plan as ending on Mar. 31.

the plan year beginning before January 7, 1981, a reasonable interpretation of the rules set forth in Rev. Rul. 75–481, 1975–2 C.B. 188, could be relied upon. Sec. 1.415–1(f), Income Tax Regs. That ruling, at section 5.02 (1975–2 C.B. 188, 192), states:

Until regulations are issued, a plan may not provide for automatic adjustments of the dollar limitations set forth in section 415(b)(1)(A) and 415(c)(1)(A) of the Code.

The final regulations, at sections 1.415–5(a)(2) and 1.415–5(c)(1), Income Tax Regs., state:

Sec. 1.415–5. Cost of living adjustments for defined benefit plans.—(a) *Dollar limitation*— * * *

(2) *Effective date of adjustment.* The adjusted dollar limitation applicable to defined benefit plans is effective as of January 1 of each calendar year and applies with respect to limitation years ending with or within that calendar year.

\* \* \* \* \* \* \*

(c) *Automatic cost-of-living adjustments of dollar limitation*—(1) *General rule.* A defined benefit plan may include a provision which provides for an annual automatic cost-of-living adjustment of the dollar limitation described in section 415(b)(1)(A) in accordance with paragraph (a) of this section. However, the provision may only provide for scheduled annual increases in the dollar limitation which become effective no sooner than the date determined in accordance with paragraph (a)(2) of this section.

In 1982, Congress adopted TEFRA. Section 235(f) of TEFRA, *supra*, 96 Stat. at 507–508, added language to section 404 (of the Internal Revenue Code of 1954 as amended) as follows:

(j) Special Rules Relating to Application With Section 415.—

(1) *No deduction in excess of section 415 limitation.*—In computing the amount of any deduction allowable under paragraph (1), (2), (3), (4), (7), or (10) of subsection (a) for any year—

(A) In the case of a defined benefit plan, there shall not be taken into account any benefits for any year in excess of any limitation on such benefits under section 415 for such year * * *

\* \* \* \* \* \* \*

(2) No advance funding of cost-of-living adjustments. —For purposes of clause (i), (ii) or (iii) of subsection (a)(1)(A), and in computing the full funding limitation, there shall not be taken into account any adjustments under section 415(d)(1) for any year before the year for which such adjustment first takes effect.

The report of the Senate Finance Committee with respect to TEFRA states:

The bill clarifies present law by providing that anticipated cost-of-living adjustments to overall benefits limits may not be taken into account under the rules relating to the deduction allowed for employer contributions to a qualified defined benefit pension plan. [S. Rept. 97–494, at 315–316 (1982).]

The Conference report similarly states that "the conference agreement clarifies present law" with respect to prohibition of deductions based upon funding defined benefit plans for anticipated cost-of-living adjustments. H. Rept. 97–760 (Conf.) (1982), at 618.

The 1982 legislation also changed the amount of the dollar limitations contained in section 415 and imposed a temporary freeze on cost-of-living adjustments.[3]

The basis for respondent's adverse determination letter is the second sentence of the following paragraph 5.1(f) of article V of the subject plan:

The $8,175.00 [maximum monthly benefit] limitation shall be increased as provided by Paragraph 415(d)(1)(A) of the Internal Revenue Code. The Actuary shall take into account such *future increases* when determining the funding of benefits as required by Paragraph 8.2 of Article VIII of the Plan. [Emphasis supplied.]

Respondent contends that the plan is not qualified because of failure to comply with the requirement of section 1.415–5(c)(1), Income Tax Regs., that funding of automatic cost-of-living adjustments may become effective no sooner than the effective date of the adjustment in the maximum permitted benefit. Respondent admits that the first sentence of paragraph 5.1(f) of petitioner's plan would not, standing alone, violate section 415 and arguably could be construed as incorporating by reference the "effective date rule" of section 1.415–5, Income Tax Regs. According to respondent, however, the second sentence of paragraph 5.1(f) directly contradicts "what would be the impact of the 'effective date rule.'" Respondent quotes from the supplementary information published concurrently with section 1.415–5, Income Tax Regs., T.D. 7748, 46 Fed. Reg. 1687, 1689 (Jan. 7, 1981), which states:

the limitations of section 415 are an appropriate context in which to preclude the making of deductible contributions based on anticipated increases of the dollar limitation, *which is the effect of such restriction*. [Emphasis supplied.]

---

[3]Sec. 235(a) and (b), 96 Stat. 505.

Respondent asserts that:

The detailed rules in Treas. Reg. sec. 1.415–5 are designed to preclude a plan from taking larger *current* deductions for contributions to the plan by funding for benefits in excess of the current year's dollar limitation. *See* Rev. Rul. 81–195, 1981–32 I.R.B. 5. This result is achieved by requiring the plan to incorporate language so that the annual cost-of-living adjustment is not effective *until* the calendar year to which it actually applies. By requiring this specific language in the plan, the maximum benefit under the plan for the current and all subsequent years, based on the plan in effect in the current year, is limited to the dollar limitation for the current year. Furthermore, any funding costs that would be attributable to anticipated *future* increases in the maximum dollar limitation are not deductible. The portion of the funding costs attributable to anticipated future increases in the dollar limitation, also known as excess funding, would be attributable to an anticipated increase in plan benefits that become effective in future years.

Petitioner argues that (i) the language of the plan complies with sections 401 and 415 because it does not permit *benefits* exceeding the limitations specified; (ii) respondent has based the adverse determination on potential *operational* defects in funding benefits or deducting contributions; (iii) the only statutory maximum limitations on funding are that contributions do not exceed the difference between the present value of all future benefits and the value of plan assets; and (iv) limitations on deductions with respect to defined benefit plans, unlike those applicable to defined contribution plans, are measurable only in terms of the actuarially determined amount of contributions required to meet the minimum funding standards of section 412. Petitioner predicates his argument on the fact that section 401(a)(16) specifically refers to limitations on benefits and contributions as issues of qualification, but fails to require a limitation on deductions in accordance with section 404 or compliance with the funding requirements of section 412 as prerequisites to qualification. Petitioner concludes, therefore, that the question of advance funding for anticipated adjustments to maximum benefits of a defined benefit plan can be considered only in reviewing operation of the plan and not in determining initial qualification.[4] In other words, petitioner's position is that potential

---

[4]Petitioner cites *Thompson v. Commissioner*, 71 T.C. 32, 37–38 (1978), for the proposition that this Court cannot entertain declaratory judgment jurisdiction over allegations related

nondeductible contributions and excess funding have been dealt with by Congress by means other than nonqualification, and respondent has therefore exceeded his authority by denying qualification of petitioner's plan. Petitioner contends that section 1.415–5(c)(1), Income Tax Regs., is thus invalid and cannot be relied upon as a basis for disqualification.

Petitioner also contends that the language of the second sentence of section 1.415–5(c)(1), Income Tax Regs., is ambiguous and that the effect of such language as interpreted by respondent in the supplementary information, *supra*, is arbitrary.[5] Petitioner is not satisfied, however, with the possibility of arguing that the regulation does not accomplish respondent's stated purpose. Petitioner has expanded his argument beyond the question of qualification and, in so doing, has announced that his intended use of the second sentence of section 5.1(f) of the plan is to cause the actuary to anticipate future cost-of-living increases under section 415 during the process of computing a current year's contributions to the trust and consequent deductions by the employer. Petitioner asserts that, absent such projections, funding will be inadequate. Petitioner has, therefore, also asked us to invalidate section 1.412(c)(3)–1(d)(1)(i), Income Tax Regs., which provides as follows:

(d) *Prohibited considerations under a reasonable funding method—*(1) *Anticipated benefit changes—*(i) *In general.* Except as otherwise provided by the Commissioner, a reasonable funding method does not anticipate changes in plan benefits that become effective, whether or not retroactively, in a future plan year or that become effective after the first day of, but during, a current plan year.

Petitioner contends that the above regulation "is an attempt by respondent to place pension plans in a 'straitjacket', and in

---

to operational defects in a retirement plan. The question to be determined here is not dependent upon investigation of facts relating to actual operation of the plan; it is concerned with whether the plan on its face fails to satisfy a specific requirement for qualification.

[5]The language of sec. 1.415–5(c)(1), Income Tax Regs., standing alone, does not deal with actuarial assumptions, funding, or deductibility. The justification for applying that regulation to this plan and to disqualifying the plan on the basis of the language in issue here is that the specification that scheduled increases "become effective no sooner than" is the equivalent of "may not be implemented in any way before" the effective date of the cost-of-living adjustment. A more limited interpretation of that language would render it essentially meaningless.

fact results in cost estimates that are not reasonable," contrary to the legislative intent expressed in section 412.

But for petitioner's elaboration with respect to the purpose of the subject language of the plan, we might be able to interpret that language as consistent with section 1.415–5(c)(1), Income Tax Regs. Because the first sentence of plan section 5.1(f) incorporates the limitations of section 415(b) as adjusted by section 415(d)(1)(A), it would be possible to assume—absent further information concerning petitioner's intended use of that language—that the second sentence reference to "such future increases" contemplates only those in effect as of the time that the actuarial computation is made. Such narrow interpretation of the language would have the virtue of avoiding total disqualification of petitioner's plan. Respondent could then disallow any deductions based on actuarial assumptions impermissible under section 412 or regulations adopted in relation thereto. We could then leave to respondent the task of filling in, with amendments to the regulations, appropriate language more clearly dealing with the problem we face here. Compare *BBS Associates, Inc. v. Commissioner*, 74 T.C. 1118, 1133 (concurring opinion) (1980), affd. in an unpublished opinion (3d Cir. 1981). This approach, though appealing, is unrealistic in view of petitioner's avowed position that the actuary may and should anticipate unannounced but projected cost-of-living adjustments not yet in effect under section 415(d) and the regulations expressly contemplated by that section.

The logical end point of petitioner's argument is that language of a proposed plan that, if carried into operation, would undeniably result in deductions contrary to section 404 cannot be considered in responding to petitioner's request for an advance determination that the plan is qualified for favored tax treatment. Such a result would be contrary to the purpose of the advance ruling system in that it would suggest an approval of a plan by the Commissioner even though specific portions of the plan were known to be contrary to the structure intended by Congress. Certainly such a scenario might lead to misplaced reliance on the advance determination.

If petitioner had not intended that his plan directly contravene the purpose of the regulations as explained by respon-

dent, he presumably would have amended the plan in the manner suggested by respondent in order to secure a favorable advance determination. By persisting in his challenge of those regulations, he took the risk of total disqualification of the plan in the event that this Court upheld the regulations as applied by respondent.

Considering all of the arguments by both parties, we are presented the issue in such a manner as to require determination of whether the disputed regulation, as adopted, is valid. We cannot avoid that issue by saying that the regulation might have utilized different language to achieve its stated purpose.

## II. VALIDITY OF SECTION 1.415–5(c)(1), INCOME TAX REGS.

Respondent asserts that section 1.415–5(c)(1), Income Tax Regs., is appropriate either as a "legislative" regulation specifically authorized by section 415(d)(1)(A) or as an "interpretative" regulation properly issued in relation to section 415. The former type of regulation is entitled to greater deference from the Court than the latter, but either must be upheld if the rules adopted by respondent "fall within his authority to implement the congressional mandate in some reasonable manner." *United States v. Correll*, 389 U.S. 299, 307 (1967); *State of Washington v. Commissioner*, 77 T.C. 656, 675 (1981), affd. 692 F.2d 128 (D.C. Cir. 1982). If the regulation at issue in this case is within the scope of respondent's authority and is reasonable, it is not necessary to classify it as legislative or interpretative.

Respondent's position is that the disputed regulation appropriately implements section 415, which was intended by Congress to allow automatic increases in benefits based upon cost-of-living adjustments but not to increase substantially other aspects of tax-favored treatment, such as current deductions for funding of pension obligations and tax-sheltered accumulation of contributions in a trust exempt from taxation under section 501. While acknowledging that *actual* funding and *actual* disallowance of deductions are not issues of qualification under section 401(a), respondent contends that the rules set forth in section 1.415–5, Income Tax Regs., further the original intent of Congress, as confirmed by

TEFRA, in prohibiting premature application of the annual cost-of-living increase in the dollar limitation of section 415.

Petitioner contends that the regulations adopted by respondent with respect to anticipated cost-of-living increases are invalid insofar as they would, in effect, incorporate into section 401 deductions limitations and funding standards under the guise of regulations issued pursuant to section 415 and thereby make them issues of qualification not so intended by Congress. According to petitioner, TEFRA changed only provisions dealing with deductions and funding and is therefore not relevant to the question of plan qualification. Petitioner concludes, based upon the legislative history of sections 401, 404, 412, and 415, that Congress intended to treat defined contribution plans and defined benefit plans as unique and placed specific dollar and percentage limitations on both *allocations* and *deductions* with respect to the former while placing specific dollar and percentage limitations on the *benefits to be paid* to participants at retirement with respect to the latter, granting the employer a deduction for whatever amount is necessary to fund for such benefits. Petitioner argues that the regulations adopted by respondent are inconsistent with the legislative intent of section 412 and contravene statutory flexibility with respect to actuarial assumptions to be used, citing H. Rept. 93–779 (1974), 1974–3 C.B. 244, 269–270.[6]

---

[6]H. Rept. 93–779 (1974), 1974–3 C.B. 244, 269–270, reads in part as follows:

"Your committee is aware that the actuarial assumptions made by actuaries in estimating future pension costs are crucial to the application of minimum funding standards for pension plans. This is because in estimating such pension costs, actuaries must necessarily make actuarial assumptions about a number of future events, such as the rate of return on investments (interest), employee future earnings, and employee mortality and turnover. In addition, actuaries must also choose from a number of funding methods to calculate future plan liabilities. As a result, the amount required to fund any given pension plan can vary significantly according to the mix of these actuarial assumptions and methods.

"Conceivably an attempt might be made to secure uniform application of the minimum funding standards by authorizing the Secretary of the Treasury or some other authority to establish the specific actuarial assumptions and methods that could be used by pension plans. This would involve, for example, setting a specific rate of interest that could be used by certain pension plans or by specifying certain turnover rates for specified types of firms. However, the committee does not believe that this would be an appropriate procedure, since the proper actuarial assumptions may differ substantially between industries, among firms, geographically, and over time. Further, in estimating plan costs each actuarial assumption may be reasonable over a significant range and it would appear that the proper test would be whether all actuarial assumptions used together are reasonable. These considerations

After careful consideration, we do not regard the language of the reports accompanying TEFRA, i.e., the statements that the addition to section 404 (with cross-reference to section 415) "clarifies present law," to be determinative of the question presented here. See *Estate of Stoll v. Commissioner*, 38 T.C. 223, 246–247 (1962).[7] It is not clear whether the statement in the reports means that the statute is declarative of or expresses prior law or whether it fills a gap or "loophole." See *Fisher Flouring Mills v. United States*, 270 F.2d 27, 28 (9th Cir. 1959). The new statutory limitation on deduction and funding does not directly answer the question of whether the absence of language precluding excess deductions or funding is a proper predicate for an advance determination that a trust does not qualify under section 401. The pertinent provisions of TEFRA, however, do support the reasonableness of respondent's position in adopting the regulation in dispute here.

Independent of TEFRA, section 1.415–5(c)(1), Income Tax Regs., may be justified as consistent with the intent of Congress. The tax advantages of qualified plans include current deductions for funding of pension obligations and tax-sheltered accumulation of contributions as well as deferral of tax on and special tax treatment of benefits to the participant. Petitioner is correct that Congress was concerned with the security of employee pensions and with preventing erosion of the value of pensions due to inflation. H. Rept. 93–779 (1974), 1974–3 C.B. 244, 266. Acknowledging that those considerations led to the minimum funding standards of section 412 and the cost-of-living adjustment provisions of section 415 is not inconsistent with recognizing the balancing engaged in by Congress of the identified goals to be achieved and the cost of achieving those goals.

The most telling comment about the balancing process is found in the House report cited at length by both parties, H. Rept. 93–779, *supra*, 1974–3 C.B. at 277–278:

your committee has concluded that it is not in the public interest to make the substantial favored tax treatment associated with qualified retirement

---

strongly indicate that any attempt to specify actuarial assumptions and funding methods for pension plans would in effect place these plans in a straitjacket so far as estimating costs is concerned, and would be likely to result in cost estimates that are not reasonable."

[7]See also *Estate of Newman v. Commissioner*, T.C. Memo. 1979–223.

plans available without any specific limitation as to the size of the contributions or the amount of benefits that can be provided under such plans. The fact that present law does not provide such specific limitations has made it possible for extremely large contributions and benefits to be made under qualified plans for some highly paid individuals. While there is, of course, no objection to large retirement benefits in themselves, your committee believes it is not appropriate to finance extremely large benefits in part at public expense through the use of the special tax treatment. Moreover, the fact that there are no specific limits on the size of the contributions or benefits that may be made under qualified plans on behalf of highly paid employees discriminates against the self-employed whose contributions or benefits under H.R. 10 plans are limited by law. For this reason, your committee has provided specific limitations on the amount of contributions and benefits that can be provided for any one individual under a qualified plan. These limitations, which apply to both employees and self-employed people under qualified plans, have been designed to avoid abuse of the favored tax treatment to finance extremely large pensions. However, the limitations are generous enough to permit substantial retirement benefits which are adequate judged from any reasonable standard.

The emphasis on *financing* large pensions at public expense through favored tax treatment (rather than on a per se objection to large pensions) necessarily expresses a concern with current deductibility of the contributions which would finance such pensions, whether paid under defined benefit plans or defined contribution plans. The benefits will, of course, be taxed when ultimately received. It is possible to audit some, but not all, plans and to disallow deductions improperly taken and to disqualify plans incorrectly operated. The most efficient, effective, and immediate means of controlling "abuse of tax favored treatment" is to preclude implementation of plans that threaten to increase the cost of the pension system in unintended ways.

It is not apparent that Congress intended that actuaries include assumptions as to future cost-of-living adjustments when calculating a current year's contributions or that the possibility of future increases would open the door to additional current deductions. It is unlikely that the additional public expense of such assumptions was or could have been considered in setting the level of contributions or benefits to be financed by tax concessions. Congress did expressly authorize regulations dealing with cost-of-living adjustments under section 415(d)(1). We do not find that section 1.415–5(c)(1), Income Tax Regs., is unauthorized or unreasonable, and we must therefore uphold its validity.

### III. Petitioner's Miscellaneous Contentions

*1. Effective Date of Section 1.415–5(c)(1), Income Tax Regs.*

Section 1.415–1(f), Income Tax Regs., states that section 1.415–5(c)(1), Income Tax Regs., is effective for plan years beginning after 1975 and that, for all such plan years through the plan year beginning before January 7, 1981, a reasonable interpretation of the rules set forth in section 415 and in Rev. Rul. 75–481, 1975–2 C.B. 188, may be relied upon. As indicated above, Rev. Rul. 75–481, *supra*, provided that a plan could not provide for automatic adjustments of the dollar limitations set forth in section 415(b)(1)(A) until final regulations were issued. The final regulations were not published until 1981 and at that time did permit, in section 1.415–5(c), Income Tax Regs., automatic adjustments of the dollar limitations subject to the prohibition on advance funding of those adjustments by the language in dispute here.

Petitioner argues that even if section 1.415–5(c)(1), Income Tax Regs., is held to be valid, which it is here, it should not apply to petitioner's plan for the years in issue because petitioner relied on a reasonable interpretation of section 415. Petitioner argues that Rev. Rul. 75–481, *supra*, was unsupported in law, and it was "tantamount to an abuse of authority" for respondent to state that particular language could not be included in a plan until regulations were issued and then to allow 5 years to elapse before the regulations in fact were issued.

Absent anything else, petitioner's interpretation of section 415 might have been reasonable. However, petitioner cannot claim reasonable reliance on that section and on Rev. Rul. 75–481, *supra*, when the language of petitioner's plan directly contravenes the revenue ruling. Rather than reasonably relying on it, petitioner took the risk of disregarding the revenue ruling.

*2. New Matters*

Petitioner argues that respondent has improperly raised new matters. Petitioner's argument is based upon changes in statements of respondent's position as it evolved from the time of the adverse determination letter through respondent's briefs. The crux of petitioner's argument is that the denial of qualification was based on funding and deductibility issues.

Respondent admits "inaccuracy" of the explanation of the determination and asserts that the official position of the Internal Revenue Service is set forth in respondent's opening and reply briefs. Respondent insists that the adverse determination was not based upon an operational defect but upon the failure of the plan to explicitly state, as required by section 1.415–5, Income Tax Regs., when the adjusted dollar limitation is effective.

Although the explanation of the basis for the adverse determination may have changed, there has been no change in respondent's position as to the specific provisions of the plan that are objectionable. It is true that adjudication in this case is to be based upon the materials contained in the administrative record, and new evidence cannot be introduced without permission of the Court. Rule 217(a); Note at 68 T.C. 1048 (1977). There is no doubt, however, that respondent's position has been consistently based upon the same section of the plan and the same provisions of the regulation. A refinement of the manner of expression of the legal reasons for the position is not new evidence and is not the type of new matter that prejudices petitioner.

## IV. CONCLUSION

Because section 1.415–5(c)(1), Income Tax Regs., is valid and has been correctly applied to petitioner's plan, respondent's adverse determination letter must be sustained.

*An appropriate order will be entered.*