**STATE OF WASHINGTON**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

No. 82–1108.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 1982.

Decided Oct. 19, 1982.

Appeal from a Decision of the United States Tax Court (Tax Court No. 16153–79B).

Gilbert S. Rothenberg, Atty., Dept. of Justice, Washington, D.C., with whom Glenn L. Archer, Jr., Asst. Atty. Gen., and Michael L. Paup and Richard Farber, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellant.

Walter D. Haynes, Washington, D.C., with whom C. Willis Ritter and David L. Miller, Washington, D.C., were on the brief, for appellee.

Before ROBINSON, Chief Judge, and WRIGHT and WALD, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

The Commissioner of the Internal Revenue Service (IRS), appellant, seeks review of a Tax Court decision which held that the discount and issuance expenses incurred by the State of Washington, appellee, on a proposed sale of bonds can be considered in computing bond yield under Section 103(c)(2)(A) of the Internal Revenue Code (IRC).[1] Because we find the Tax Court decision to be the correct interpretation of the statute, we affirm.

## I. BACKGROUND

In April 1971, the State of Washington issued limited revenue bonds to finance the construction of public schools.[2] These bonds bear semiannual interest rates ranging from six percent to eight percent, are redeemable beginning in 1986, and mature annually on May 1 of each year through 2001. Following issuance of these bonds, the State amended its constitution in November 1972 to authorize the State to pledge its full faith, credit, and taxing power to the payment of debt service on new bonds which otherwise would be payable only from the limited revenues pledged to outstanding bonds. Because bonds backed by the full faith and credit of the State are assigned higher credit ratings and can bear lower interest rates, the State decided to refund the outstanding limited revenue bonds with general obligation bonds. It could thereby reduce the cost of its debt service.

On December 5, 1978, the State authorized the issuance of approximately $15 million of general obligation bonds. Under the proposed issuance plan, the bonds would be sold by sealed bid at a public auction. They would be awarded to the bidder whose offer, taking into account the coupon rate and the price to be received, achieves the lowest net cost for the State. The proposed bonds would bear coupon rates ranging from four and three-quarters percent to five and five-eighths percent. The State anticipates that the refunding bonds would issue at 98.5 percent of par, and that the purchaser would resell the bonds to the public at 100 percent of par. However, the purchaser would acquire complete ownership of the bonds and would be under no obligation to the State to resell them. The State expects

---

1. 26 U.S.C. § 103(c)(2)(A) (1976).

2. The bonds are limited obligations because they are payable only from specifically identified revenues of certain designated trust funds. In addition, the State has funded and maintained a reserve account for the outstanding bonds in an amount equal to at least two times the maximum amount of principal and interest payable in any year. Approximately $5 million has thus far accumulated in that account.

to incur approximately $40,000 in issuance expenses, including attorney fees, printing and delivery costs, and preparation and distribution costs. Since the outstanding bonds cannot be immediately redeemed and retired, the State also plans to invest the proceeds of the issuance in direct obligations of the United States.[3]

As is the customary practice, the State requested the IRS to rule[4] that the bonds would not be "arbitrage bonds" within the meaning of the IRC and therefore that the interest paid to holders of its bonds would be exempt from taxation.[5] Under Section 103(c), the interest on state or municipal bonds will not be tax exempt if the issuer invests the receipts in taxable securities which produce a greater "yield," and thereby earns profits solely at the expense of the Federal Treasury.[6] Section 103(c)(2) provides, in pertinent part, that

the term "arbitrage bond" means any obligation which is issued as part of an issue all or a major portion of the proceeds of which are reasonably expected to be used directly or indirectly—

(A) to acquire securities * * * or obligations * * * which may be reasonably expected at the time of issuance to produce a yield over the term of the issue which is materially higher (taking into account any discount or premium) than the yield on obligations of such issue[.]

In its request, the State asked the Commissioner to rule that the proposed issuance

and reinvestment plan fell within the safe harbors of this section, and thus did not constitute taxable arbitrage bonds.

The State calculated Section 103(c)'s "yield" rate by taking into account both the discount and issuance expenses it would incur in selling the bonds. Treasury regulations provide that "the term 'yield' means that yield which when used in computing the present worth of all payments of principal and interest to be paid on the obligation produces an amount equal to the purchase price." Treas.Reg. § 1.103–13(c)(1)(ii) (1978).[7] But applicable regulations also prohibit the inclusion of administrative costs and discount in the purchase price component of the yield calculation. See Treas.Reg. § 1.103–12(d)(1) and (d)(2) (1978). Because of these latter regulations, the IRS determined that the issuance constituted arbitrage bonds. Therefore, the Commissioner denied the State's request for approval of its plan as a tax-exempt issuance.

The State responded by filing an action in the Tax Court for a declaratory judgment that its proposed issuance would not constitute "arbitrage bonds."[8] The Tax Court agreed with the State. It held that discount and issuance expenses were part of the cost of borrowing money, and that Congress had intended that all such costs be taken into account in determining whether "arbitrage profits" would be earned on investments of tax-free bond receipts. *State of Washington v. Comm'r of Internal Reve-*

---

**3.** The State will invest in U.S. Treasury certificates bearing coupon rates of 5.755 percent. Joint Appendix (JA) at 168. It will also invest $5 million of accumulated reserve account funds from the limited obligation bonds in open-market obligations of the United States. *Id.* Each set of U.S. Treasury obligations matures in 1986.

**4.** This request, submitted on March 1, 1979, properly followed the procedures set forth in Rev.Proc. 79–4, 1979–1 C.B. 483.

**5.** Interest received by a taxpayer on an obligation of a state or municipality is, as a general rule, exempt from federal income tax. 26 U.S.C. § 103(a) (1976). The recognized purpose of this exemption is to aid state and local governments in the raising of moneys by allow-

ing them to issue marketable bonds at interest rates below those of corporate and federal securities. J. CHOMMIE, FEDERAL INCOME TAXATION § 36 (1973).

**6.** 26 U.S.C. § 103(c) (1976).

**7.** The Treasury regulations attempt to define effective economic yield. An equivalent but more shorthand yield calculation can be done by dividing the nominal rate of interest a bond pays by the real purchase price. *See generally* A. ALCHIAN & W. ALLEN, UNIVERSITY ECONOMICS 205–209 (2d ed. 1967).

**8.** The IRC provides for such declaratory judgment actions. *See* 26 U.S.C. § 7478 (1976).

*nue,* 77 T.C. 656 (1981).[9] The Commissioner appeals this judgment.

## II. CONSISTENCY OF STATUTE AND REGULATIONS

Section 103(c)(6) specifically provides that "[t]he Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this subsection." [10] The Tax Court, however, found that the regulations excluding administrative costs and discounts from the yield calculation (vis-a-vis the purchase price) were inconsistent with the statute and therefore exceeded the bounds of permissible administrative flexibility.[11] The Commissioner advances three arguments in appealing this judgment: (1) that the Tax Court improperly gave the term "yield" two different meanings; (2) that the Tax Court failed to give effect to Congress' intent in enacting the arbitrage provisions; and (3) that the Commissioner's experience in administering the arbitrage provisions illustrates the reasonableness and necessity of his regulations. We examine each argument separately.

### A. *Interpretation of Term "Yield"*

■ As previously noted, Section 103(c)(2) deems bonds to be "arbitrage bonds" if the proceeds will produce

> a yield over the term of the issue which is materially higher (taking into account discount or premium) than the yield on * * * [the] obligation [itself] * * *.

The Tax Court held that while the language of Section 103(c)(2) is far from clear, it seemingly requires a comparison between the rate of return the State as bond issuer earns on its investment in U.S. Treasury certificates and the rate of return the first purchaser earns on the State's bonds. 77 T.C. at 669. The Tax Court's position essentially is that the term "yield" refers to the issuer's—the state government's—cost of money: the cost of refunding one issue and of purchasing another. Since discount and issuance expense are part of the cost of money, the Tax Court concluded that the State should be able to include them in the yield calculation.

The Commissioner contends, however, that the Tax Court applied two different interpretations of the term "yield"—the first referring to the rate of return to the State as holder of federal obligations, and the second referring to the cost to the State as issuer of its own bonds. Giving two meanings to the same term in the same section violates a cardinal rule of statutory construction, and the Commissioner therefore urges that the Tax Court be reversed. The Commissioner would instead require states and municipalities to calculate yield in terms of the rate of return to the respective holders: the purchasing public and the issuer. This calculation, he contends, would give consistent meaning to the term "yield" in Section 103(c)(2).

### 1. *Discount.*

The State and the Tax Court present the better construction of the statutory term. "Yield" has a common and accepted meaning: it is the economic return on a debt instrument. THE AMERICAN COLLEGE DICTIONARY 1415 (1962); 1 S. LEVINE, FINANCIAL ANALYST'S HANDBOOK 339 (1975); G. MUNN & F. GARCIA, ENCYCLOPEDIA OF BANKING AND FINANCE 948 (7th ed. 1972). The Treasury regulation that defines the term "yield" accepts this common meaning by defining it to be the rate "which, when used in computing the present worth of all payments of principal and interest to be paid on the obligation, produces an amount equal to the purchase price." Treas.Reg. § 1.103–13(c)(1) (1978). "Yield" therefore changes whenever a different purchase price is paid. But whenever a bond is sold—from state to underwriter or from underwriter to public—a different purchase price is paid, and a different yield must result. Yield can be

---

9. One member of the Tax Court, Judge Chabot, dissented. In his view, the Treasury regulations defined "yield" consistently with both the statute and the common meaning of that term. 77 T.C. at 676.

10. 26 U.S.C. § 103(c)(6) (1976).

11. 77 T.C. at 676.

consistently determined only by using the purchase prices in the transactions to which the State was a party—the purchase price paid to the State for its bonds and the purchase price paid by the State for the U.S. Treasury certificates. It is the State that borrows money, and it is the State that buys Treasury certificates; only the State can earn arbitrage profits, and only the State can eliminate those profits by restricting the yield of its investment. By interpreting the relevant purchase prices to be those in the transactions to which the State was a party, the Tax Court used the same parameter in calculating the permissible yield, and thus applied one (not two) interpretation(s) of the statutory term.

The Commissioner's argument—that the relevant purchase price of the State's issuance is the one paid by the public—makes sense only if the price at which an underwriter resells the bonds to the public can be attributed to the State. If attribution is possible, then the effective price would not be a discounted one and the effective yield to the State would be higher. But attribution is not possible in this case: The proposed bond sale is to be undertaken pursuant to sealed bids, the purchaser will be the one making the best offer, and the purchaser will have no continuing obligation to the State. The important incidents of ownership—especially the risk that the value of the bonds may rise or fall—shifts to the underwriter, and the discount on par is a genuine reduction in the purchase price. Thus, the discount should be taken into account in computing the rate that makes

the present worth of the future principal and interest payments equal to that purchase price.

The most natural reading of the statute supports the Tax Court's and the State's interpretation. To begin with, the statute expressly contemplates that discounts should be taken into account in calculating "yield." [12] Congress specifically provided that arbitrage bonds would exist only if the proceeds available from the sale of the bonds were invested in taxable obligations with a yield materially higher than the yield on the bonds themselves, "taking into account any discount" incurred. 26 U.S.C. § 103(c)(2)(A) (1976). Congress' specific reference to discount was consistent with a substantial body of case law and published IRS rulings that existed when Section 103 was enacted. *See, e.g., United States v. Midland-Ross Corp.,* 381 U.S. 54, 57, 85 S.Ct. 1308, 1310, 14 L.Ed.2d 214 (1967) ("[D]iscount serves the same function as stated interest * * *; it is simply 'compensation for the use or forebearance of money.'"); Rev.Rul. 60–210, 1960–1 C.B. 38 ("discount at which bonds and similar obligations were *issued* constitutes compensation * * * and, hence, was the equivalent for Federal income tax purposes") (emphasis in original). Congress was genuinely attempting to compare the cost to the state of issuing debt with the actual return to the state on the debt it purchases, and therefore specifically stated that discount should be taken into account. *See Helvering v. Union Pacific R. Co.,* 293 U.S. 282, 283, 286, 55 S.Ct. 165, 166,

---

**12.** The Commissioner makes the alternative argument that the difference between the purchase price and par is not "discount" in the terms of § 103(c) when an underwriter purchases the bonds. *See* reply brief for appellant at 5–6. He properly concedes that the "underwriter's spread represents compensation to the underwriter for its services in marketing the bonds to the public and for the risks it assumes in purchasing the bonds outright from the State without any guaranty [*sic*] that it will be able to resell the bonds to the public at a profit." *Id.* Since the discount is, however, set competitively, it is "an adjustment of the difference between the interest prescribed in the instrument issued and the prevailing market rate for money," and is therefore a true discount.

*Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 150, 94 S.Ct. 2129, 2138, 40 L.Ed.2d 717 (1974); *United States Playing Card Co. v. Commissioner,* 15 B.T.A. 975, 981–982 (1929); Rev.Rul. 60–210, 1960–1 C.B. 38. In any event, the underwriter's spread is part of the cost of raising money, and it affects the yield on the issuance of the bonds. *See United States v. Midland-Ross Corp.,* 381 U.S. 54, 57, 85 S.Ct. 1308, 1310, 14 L.Ed.2d 214 (1965); *Helvering v. Union Pacific R. Co.,* 293 U.S. 282, 283, 286, 55 S.Ct. 165, 166, 167, 79 L.Ed. 363 (1934). Including the underwriter's spread in the yield calculation, therefore, will not result in the State earning unjustified arbitrage profits.

167, 79 L.Ed. 363 (1934). Second, the statute uses the term "yield" both for bonds issued by the State and for securities acquired by the State. The key denominators in the statute are the purchase prices in transactions to which the State was a party; the determination of whether the State will make arbitrage profits can be comfortably made only by using these purchase prices. The Commissioner encourages the awkward construction that would require the State to compute "yield" by reference to two transactions, one in which the State *is* a party, and one in which it *is not.*

### 2. *Issuance expenses.*

Deciding whether the Tax Court permissibly allowed the State to include issuance costs in the yield calculation is, however, a more difficult issue. While the term "discount" explicitly appears in Section 103(c), the term "issuance expenses" does not. Thus, Congress may intentionally have drawn a distinction between "discount" and "issuance expenses" in identifying precisely which costs the State could take into account in determining the permissible reinvestment yield. But such a congressional intent is unlikely. Issuance expenses—legal fees, printing costs, advertising expenses, and so on—are outlays made to procure money, are incurred directly in connection with the bond issuance, and effectively reduce the money available from the issuance. They thereby reduce the real economic value of the debt instrument to its issuer. When Congress required states and municipalities to restrict their reinvested proceeds to "yields" not materially higher than the "yields" on their Section 103 issuances, there had been a long and consistent practice of requiring issuance expenses to be treated the same as discounts. The Treasury had for years been unable to draw a distinction "between expenses [like bond discount] and other expenses incidental to the issuance of the bonds * * *." G.C.M. 14349, XIV–1 C.B. 36 (1935). Nor had the courts drawn such a distinction. *See Denver & Rio Grande Western R. Co.,* 32 T.C. 43, 51 (1959), Acq. 1959–2 C.B. 4, *aff'd on other issues,* 279 F.2d 368 (10th Cir. 1960);

*Leach Corporation,* 30 T.C. 563, 579 (1958), Acq. 1959–1 C.B. 4; *Julia Stow Lovejoy,* 18 B.T.A. 1179, 1182 (1930); *Chicago, Rock Island & Pacific R. Co.,* 13 B.T.A. 988, 1035 (1928). Since Congress created a very mechanical test for identifying arbitrage bonds, it is unlikely that it meant to draw, or to give the IRS discretionary authority to create, a distinction which had not previously existed. In short, the most natural reading of both the statute and the commonly accepted meaning of the term "yield" calls for including both discount and issuance expenses in the determination of purchase price (and the calculation of yield).

### B. *The Legislative Purpose*

The Tax Court further supported its conclusion that discount and issuance costs should be included in the yield calculation by resorting to Section 103(c)'s legislative purpose: that of eliminating arbitrage profits. Since the State was proposing only to recover its discount and issuance expenses—and not to earn a profit—the Tax Court concluded that the Commissioner had no authority to prohibit the inclusion of these costs in the yield calculation.

The Commissioner, however, finds an entirely different legislative purpose underlying the arbitrage provisions. His view is that Section 103 was designed principally to ensure that arbitrage considerations do not play a significant role in the states' or municipalities' decisions to issue bonds. Since allowing states to recover bond discount and issuance expenses will marginally encourage the advance refunding of bonds, the Commissioner claims that the regulations are a valid exercise of his authority to administer the statute. Since this justification turns entirely on the purpose Congress had in mind in enacting Section 103(c), we turn to the legislative history to divine the section's origin and purpose. *See Nat'l Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979) (stating that legislative history is useful in finding original intent).

Section 103(c) was added to the Code as part of the Tax Reform Act of 1969.[13] At the time of enactment, Congress was concerned that local governments were selling bonds at low tax-exempt yields, reinvesting the bond proceeds in higher yielding taxable securities, and thereby earning arbitrage profits.[14] The legislation ultimately enacted was patterned after bills introduced in the House by Representative John Byrnes, see H.R. 11757, 90th Cong., 1st Sess. (1967), and in the Senate by Senator Abraham Ribicoff, see S. 2636, 90th Cong., 1st Sess. (1967). In introducing his bill, Representative Byrnes stated:

The mechanics of an arbitrage bond are simple. A State or local government issues bonds and agrees to invest the proceeds in Federal bonds which are then placed in escrow for the payment of interest and principal on the State or local bonds. The investor in these bonds has a certificate which represents neither more nor less than an interest in Federal bonds, but because the interest payments made by the Federal Government pass through the hands of the State or local government it is argued that the interest is exempt. The local government thus *makes a profit* from the interest differential that exists between the taxable Federal securities and the nontaxable securities which it purports to issue.

* * * Arbitrage bonds really represent an agreement by the issuer to act as a conduit or trustee for passing interest on Federal bonds to private persons and they are not "obligations" of a State or local government within the meaning of existing law. * * *

113 Cong.Rec. 20033 (daily ed. July 25, 1967) (statement of Representative Byrnes) (emphasis added). Senator Ribicoff likewise indicated his concern with the arbitrage *profits* local governments were making on the interest differentials between state and federal bonds.

The local government seeks to *make a profit* from the difference in interest rates that would arise, since interest on Federal bonds is taxable and the interest paid by the local government is claimed to be exempt. And this profit is claimed on the sole ground that the local government lends its name to a security—without assuming any risk, or responsibility, or work, or anything else.

113 Cong.Rec. 31613 (daily ed. November 8, 1967) (statement of Senator Ribicoff) (emphasis added).

The Senate Finance Committee similarly perceived the role of the legislation as ensuring that the Federal Government does not "[become] an unintended source of revenue for State and local governments," see S.Rep. 91–552, 91st Cong., 1st Sess. 219 (1969) (1969–3 Cum.Bull. 423, 563), and therefore defined arbitrage bonds as

obligations issued to acquire other securities where the rate of return on the other securities produces a higher yield than the interest cost on the initial bond issue.

*Id.* The Finance Committee's action was in response to a statement by the Treasury Department that

an obligation be considered an "arbitrage obligation" if [the facts] demonstrate that the *result* of the issuance is the realization of an arbitrage *profit* from reinvestment of the proceeds in higher yield securities * * *.

Technical Memorandum of Treasury Position on Tax Reform Act of 1969, Senate Finance Committee Print 117–120 (Sept. 30, 1969) (emphasis added). Thus, even the Treasury Department recognized that the primary concern was with *profits* that state and municipal governments were making at the expense of the federal government.[15]

---

**13.** Section 103(c) was originally enacted as § 103(d); however, it was redesignated § 103(c) in the Tax Reform Act of 1976, Pub.L. No. 94–455, 26 U.S.C. § 103(c) (1976).

**14.** *See also* Surrey, *Tax Trends and Bond Financing,* 22 Tax Lawyer 123 (1968).

**15.** The Commissioner first addressed the problem of arbitrage bonds when he declined to issue rulings about whether certain municipal or state bonds qualified for tax-exempt interest. These bonds were

Though the enacting Congress was clearly concerned that states and municipalities might act as "conduits" to turn taxable investments into nontaxable ones, Section 103(c) did not directly reflect this thinking. Congress *could* have addressed all of the improper incentives states and municipalities might have for issuing tax-exempt bonds. But Congress did not. Rather, Congress chose to deal only with the narrower problem of curtailing arbitrage profits. This was, in the Tax Court's words, the "main concern" of Section 103(c)'s sponsors. 77 T.C. at 668. Therefore, as the proceeds of the State of Washington's bonds were not to be invested to earn the arbitrage profit that Congress was seeking to foreclose, the Tax Court properly held that they were not arbitrage bonds within the meaning of Section 103.

### C. *Reasonableness of Commissioner's Regulations*

Following passage of the Act, the Commissioner regularly interpreted Section 103(c) as being aimed at unjustified arbitrage profits. It published Temporary Regulations and thereafter Proposed Regulations which took the position that, in computing yield, the actual bid price to the issuer—taking into account any discount—should be used.[16] Treasury repeatedly emphasized that

> Congress sought to prevent advance refundings which generate arbitrage—that is, profits based upon the difference between the cost to the issuer of the advance refunding issue and the returns from investment of bond proceeds * * *.

issued by * * * governmental units where a principal purpose is to invest the proceeds of the tax-exempt obligations in taxable obligations, generally United States Government securities, bearing a higher interest yield. The *profit* received by the governmental units on the difference between the interest paid on the exempt obligations and the interest earned on the taxable obligations is in the nature of arbitrage.

T.I.R. 840 (Aug. 11, 1966), STAND. FED. TAX REP. ¶ 6701 (CCH 1966) (emphasis added).

**16.** Temp.Reg. § 13.4(a)(5) (Nov. 13, 1970); Prop.Reg. § 1.103–12(c) (June 1, 1972; May 3,

Treasury News Release, September 24, 1976. Although both Congress and the Treasury were concerned with states and municipalities acting as conduits, Treasury continuously interpreted the statute to be limited to preventing these local bodies from earning arbitrage profits on the interest differential between tax-exempt bonds and the non-exempt bonds of the federal government.

By 1978, however, states and municipalities were refunding bonds in increasingly large numbers, and the expense to the Federal Treasury was growing correspondingly. In Treasury's view the ability to earn back administrative costs and discount was contributing to the payment of excessive underwriters' fees and other issuance expenses, as well as encouraging the issuance of economically unsound refundings. *See* General Statement of Policy preceding proposed amendments to Proposed Treasury Regulations §§ 1.103–13, 1.103–14, and 1.103–15, 43 Fed.Reg. 39822–39823 (1978). As a consequence, Treasury changed its official position regarding the calculation of permissible yields.[17] It announced that for purposes of computing yield, "administrative costs [should] not be taken into account" and that the "purchase price" would henceforth be "the initial offering price to the public (excluding bond houses, brokers, and other intermediaries)." Treas. Reg. § 1.103–13(d)(1) and (d)(2) (1978). Thus, Treasury changed the focus of its regulations from attacking arbitrage profits to neutralizing the possible incentives that Section 103 created for the issuance of local government securities.

1973; Dec. 3, 1975; Oct. 29, 1976; May 31, 1977). Treasury's earliest view, Temp.Reg. § 13.4(a)(5), determined that "an amount equal to the sum of the reasonably expected administrative costs of issuing, carrying and repaying [an] issue of obligations shall be treated as a discount in the selling price of such issue" for computing "yield."

**17.** IRS regulations permit an issuer to invest such proceeds in securities that produce a yield slightly higher than the yield on the bonds issued. The formula for determining what is not materially higher is not at issue in this case. *See* Treas.Reg. § 1.103–13(b)(5)(iii)(A) (1978).

■ As originally passed by the House, Section 103(c) would indeed have given the Treasury wholesale discretion to define arbitrage bonds in this manner and to pursue this broad objective.[18] But Treasury asked the Senate for a more limited grant of authority; it recommended that the bill provide that bonds would be "arbitrage bonds"

> if, under regulations prescribed by the Secretary or his delegate, the *circumstances* (including but not limited to the terms of the obligation, the specified purpose of the issue, the nature of the security provided for the obligation, and all other relevant facts) demonstrate that *the result of the issuance is the realization of an arbitrage profit* from reinvestment of the proceeds in higher yield securities. * * *

Technical Memorandum of Treasury Position, *supra,* at 117 (emphasis added). But, in the end, the Senate Finance Committee rejected a delegation even this broad. That committee—and ultimately Congress—adopted a more mechanical test which provided that bonds were "arbitrage bonds" if the proceeds were invested in securities producing a materially higher yield than the yield on the bonds themselves. 26 U.S.C. § 103(c) (1976). Furthermore, the statute specifically required the yield computation to be made "taking into account any discount." *Id.* Thus, Congress implicitly rejected any grant of unlimited authority to Treasury to define arbitrage bonds or to manipulate the components of the "yield" calculation in response to changing incentives of local governments to issue bonds. Congress instead passed legislation limited to eliminating arbitrage profits and thereby avoided (and did not give Treasury authori-

ty to address) the more slippery problem of local governments acting as investment conduits.[19]

■ The regulatory authority that Congress did grant to the Commissioner merely authorized the IRS to adopt such regulations "as may be necessary to carry out the purposes of this subsection." 26 U.S.C. § 103(c)(6). But such regulation must be directed at the elimination of arbitrage profits. Where regulations go beyond that purpose, they are invalid as an unreasonable exercise of the rulemaking power. *See, e.g., American Standard, Inc. v. United States,* 602 F.2d 256, 261 (Ct.Cl.1979). Since these regulations restrict the freedom of states and municipalities to invest the proceeds of their issuances to a degree Congress did not envision, they must be invalidated as exceeding the Commissioner's authority.

The Commissioner raises the legitimate concern that invalidating these regulations will lead both to increased numbers of unsound bond refundings and to excessive underwriters' fees and issuance costs. As support for this concern, the Commissioner notes that the volume of advance refundings increased from $56 million in 1970 to approximately $9.2 billion in 1978, and then dropped to approximately $1.8 billion after the first full year that the amended regulations were in existence. Brief for appellant at 15 n.6. The Commissioner interprets this data as conclusively proving that the ability to earn back underwriters' discount and issuance expenses has prompted many states and municipalities to issue advance refunding even though, from a societal standpoint, the overall cost of the bonds might outweigh the benefits.[20] Even if the Commis-

---

**18.** "Under regulations prescribed by the Secretary or his delegate, any arbitrage provision shall be treated as an obligation not described in subsection (a)(1)" of § 103. H.R. 13270, 91st Cong., 1st Sess. 318 (1969).

**19.** Of course, the Commissioner is free to change his interpretations of a statute. *See Nat'l Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 485, 99 S.Ct. 1304, 1311, 59 L.Ed.2d 519 (1979); *Helvering v. Wilshire Oil Co.,* 308 U.S. 90, 101, 60 S.Ct. 18, 24, 84 L.Ed.

101 (1939). But he may not adopt an interpretation inconsistent with that statute, and his previous interpretations are evidence of that statute's purpose. *Nat'l Muffler Dealers, supra,* 440 U.S. at 477, 99 S.Ct. at 1307.

**20.** Brief for appellant at 30. In proposing the 1978 regulations, Treasury noted:

> [A]ssume that the administrative costs of an advance refunding are $3 million and the gross debt service savings are $2 million.

sioner's interpretation of the data is correct, however, Congress has not given him the authority to address the problem in the manner that he has chosen.[21] Congress delegated him the authority only to eliminate arbitrage profits, and not the authority to prevent the issuance of bonds where tax incentives play a marginally determinative factor in the states' or municipalities' decisions.

 Still, states and municipalities should be chary in their issuance of tax-free bonds and their subsequent reinvestment of the proceeds. It is a fundamental principle of state and municipal bond law that the issuing body must have a legitimate, independent purpose to sell debt instruments in order to raise moneys. L. JONES, THE LAW OF BONDS AND BOND SECURITIES § 12 (1950). If no such purpose exists, the issuance would be violative of local law, and should not qualify for the tax exemption that Section 103 provides for validly issued municipal and state bonds. Moreover, the Commissioner has other powerful and permissible weapons in his regulatory arsenal for attacking excessive underwriter discounts and issuance costs. The Commissioner can legally limit the amounts that states and municipalities can legitimately incur for these purposes. He has already done so for

fees paid for financial consulting. *See* Proposed Treas.Reg. § 1.103–13(c)(1)(ii), 41 Fed.Reg. 47683 (1976). So, if such excesses appear in the future, the Commissioner may well be able to attack them straightforwardly as unnecessarily incurred. But the Commissioner cannot indirectly attack them through regulations that are inconsistent with the underlying purpose, and that rely on an awkward construction of the words, of the statute.

## III. CONCLUSION

In sum, these regulations go beyond the permissible rulemaking authority of the Treasury. We recognize that the Commissioner's definition must be upheld if it furthers "the congressional mandate in some reasonable manner," *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967), and that Congress has delegated to the Secretary of the Treasury, not to the courts, the task "of administering the tax laws of the Nation." *United States v. Cartwright*, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). But, like the Tax Court, we find that Treasury Regulations § 1.103–13(d)(1) and (d)(2) interpret the statute in a way plainly inconsistent with the enacting Congress' purpose. Ac-

There is no good reason to spend $3 million in order to save $2 million. However, under the old regulations, this transaction would be advantageous to those involved. The issuer would save nearly $2 million, and underwriters, lawyers, and financial advisors would earn $3 million, which could be recovered largely at the expense of the Federal Treasury. The public cannot benefit from a transaction in which $3 million is spent to save $2 million. * * * General Statement of Policy preceding proposed amendments to Proposed Treasury Regulations §§ 1.103–13, 1.103–14, and 1.103–15 (1978).

21. In any event, the data is inconclusive as regards the true cause of the rise and fall in advance refundings. Market factors such as changes in prevailing interest rates may have caused the fluctuations. Alternatively, the Treasury regulations may have made refunding so expensive that states and municipalities were deterred from selling sound as well as unsound bond issuances. Treasury is clearly correct that the federal fisc will bear *some* of

the administrative costs. But significant incentives remain for the states and municipalities to reduce underwriters' fees and issuance expenses. When bonds are sold by sealed bid, natural market forces reduce the size of underwriters' fees. The bidder offering the highest price will be the one willing to accept the least profit (in terms of discount). Furthermore, the Commissioner concedes that issuers will rarely recover *all* of their expenses. Brief for appellant at 21 n.13. This is because the proceeds will be used to refund outstanding bonds as they become due; the issuer recovers such expenses in full only if the proceeds are invested for the life of the issuance, and this will rarely be the case. For example, in this case the bonds issued have a life of 20 years, while the proceeds were to be invested in 7-year securities to pay off outstanding bonds that were to become due or redeemable during and at the end of the 7-year period. Thus, the State will bear some of the expenses and will have incentives to reduce those expenses to the greatest degree possible.

cordingly, we affirm the judgment of the Tax Court.

*Affirmed.*