**CITY OF COLUMBUS, OHIO, Appellant**

v.

**COMMISSIONER OF INTERNAL REVENUE SERVICE,**
Appellee.

No. 96–1282.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 24, 1997.

Decided May 13, 1997.

David L. Miller, Washington, DC, argued the cause for appellant. With him on the briefs was David A. Rogers, Washington, DC.

Kenneth W. Rosenberg, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for appellee. With him on the brief was Loretta C. Argrett, Assistant Attorney General, Washington, DC, and Richard Farber, Attorney, Cleveland, OH. Gary R. Allen, Attorney, Washington, DC, entered an appearance.

Before EDWARDS, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion of the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The City of Columbus, Ohio, issued short-term Bond Anticipation Notes to satisfy a financial obligation to the State of Ohio. Columbus intends to issue long-term bonds to refinance the currently outstanding Notes. The ultimate question in this appeal from the Tax Court is whether the city's proposed bonds would be "arbitrage bonds" within the meaning of § 148 of the Internal Revenue Code of 1986, as amended, a question of significance to the parties because interest on municipal bonds is exempt from taxation under § 103(a) of the 1986 Code, while interest on arbitrage bonds is not.

## I

Columbus had been administering two unfunded pension funds for its police officers and firefighters. Then, in the mid–1960's, the State of Ohio created the Police and Firemen's Disability and Pension Fund, a statewide pension fund replacing the unfunded plans of municipalities with a fully–funded pension plan for police officers and firefighters. This State Fund assumed the pre–1967 pension liabilities of Ohio municipalities. State law required each municipality to transfer its liabilities and assets to the State Fund and then pay the State Fund the present value of the municipality's accrued unfunded pension liability. Columbus's bill came to $42,687,799. Municipalities had the option of satisfying their obligations to the State Fund immediately or over a period of time, with interest. Columbus chose the latter course and began making annual payments to the State Fund. After several changes in state law, the city wound up with a payment schedule imposing annual interest charges of 4.25% until the year 2035.

In 1993, Ohio offered municipalities the opportunity to prepay at a discount their obligation to the State Fund in a single, lump-sum payment. *See* OHIO REV.CODE ANN. § 742.30(C) (Anderson Supp.1995). The State Fund adopted a discount of 35%, allowing municipalities to satisfy their obligations by paying 65% of their outstanding principal balance. Thirty-six Ohio municipalities, including Columbus, accepted the offer. This reduced Columbus's obligation from $41,435,720 to $26,933,218. On January 31, 1994, Columbus paid the State Fund $27,304,720, an amount representing the city's discounted outstanding principal balance plus $371,502 in interest.

Columbus had contemplated financing this 1994 payment by issuing tax-exempt bonds, and asked the IRS for a ruling that the interest on its bonds would qualify for tax exemption under § 103 of the 1986 Code. In the meantime, Columbus had issued $27,300,000 in one-year Bond Anticipation Notes in January 1994. The Notes' proceeds were transferred to the State Fund to satisfy the lump-sum agreement. When (for reasons described next) the Assistant Chief Counsel of the Treasury issued a private letter ruling against the city, Columbus once again issued one-year Notes in 1995 to pay off the 1994 Notes. These Notes were set to mature on January 30, 1996. All the proceeds of the

1995 Notes were used to pay off the 1994 Notes. Columbus intends to continue in this manner, refinancing outstanding Notes with subsequent short-term issues, until there is a final judicial determination regarding the tax status of its proposed bonds.[1] At that time, Columbus's plan is to issue long-term bonds either on a tax-exempt or taxable basis, and immediately use the bonds' proceeds to pay off outstanding Notes and associated expenses.

Columbus submitted its ruling request to the Internal Revenue Service seeking a determination that the assumed 6% interest, compounded semiannually, on its proposed long-term bonds would be excludable from the bondholders' gross income under § 103 of the 1986 Code. The private letter ruling against Columbus—that the proposed bonds would be arbitrage bonds and hence the interest on them would be included in the bondholders' gross income—rested mainly on a theory not raised in this appeal. The Assistant Chief Counsel noticed that the State Fund was earning 8.25% compounded annually on the money in the pension fund. Priv. Ltr. Rul. 95–09–035 (Mar. 3, 1995). On the other hand, the city's proposed bonds would yield 6%. The ruling stated that "the State Fund expected to be able to invest the amount of the prepayment of the City Liability at a yield that is materially higher than the yield on the issue of Proposed Bonds." *Id.* This constituted "arbitrage." No matter that two separate entities were involved, with one (the city) issuing the bonds and paying the "yield" on them, with the other (the State Fund) investing the proceeds and receiving the "yield" on those investments. There was, according to the ruling, no requirement "that investments must be owned or directly controlled by an issuer to be treated as proceeds of an issue." *Id.*

Columbus filed a petition in the Tax Court seeking a declaratory judgment that the interest on the proposed bonds would be tax-exempt. The Tax Court held that the proposed bonds would be "arbitrage" bonds within the meaning of § 148(a) of the 1986 Code. Without mentioning the theory of the

private letter ruling, the court reasoned that Columbus's prepayment of its obligation to the State Fund at a discount produced the equivalent of a 7.57484% "yield" on its "investment," a materially higher "yield" than the 6% it would be paying on the proposed bonds. The 7.57484% figure represented the per annum rate at which the city would have had to invest the amount of its lump-sum payment to have received a stream of income equal to the installment payments it would otherwise have made to the State Fund. We will have more to say about the Tax Court's rationale in a moment.

## II

■ Why the special rules about "arbitrage" bonds? The Internal Revenue Code had, for many years, excluded from gross income the interest taxpayers receive on state or local bonds. This enabled states and municipalities to issue tax-exempt bonds at interest rates favorable to them. These governmental entities also could, through so-called "arbitrage," reap returns at the expense of the federal treasury. A municipality could, for instance, issue tax-exempt bonds at 6% and then invest the proceeds in taxable securities yielding, say, 10%.[1] B. BITTKER & L. LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES, AND GIFTS ¶ 15.5.1 (2d ed.1989). The arbitrage bond provisions of the 1986 Internal Revenue Code, like their counterparts in the Tax Reform Act of 1969, Pub.L. No.91–172, 83 Stat. 656, were designed to put a stop to this practice. *See State of Washington v. Commissioner*, 692 F.2d 128, 134 (D.C.Cir.1982).

While interest on state or local bonds remains generally exempt from federal taxation, § 103(b) of the 1986 Code renders the exemption inapplicable to any "arbitrage bond" within the meaning of § 148. An "arbitrage bond," as § 148(a) defines it, is

> any bond issued as part of an issue any portion of the proceeds of which are reasonably expected (at the time of issuance of the bond) to be used indirectly or directly—

---

1. The Notes have been issued to investors without any opinion regarding their tax-exempt status

and have borne a taxable interest rate. *See* Brief for Appellant at 5 n.2.

(1) to acquire higher yielding investments, or

(2) to replace funds which were used directly or indirectly to acquire higher yielding investments.

A "higher yielding investment" is, according to § 148(b)(1), "any investment property which produces a yield over the term of the issue which is materially higher than the yield on the issue." "Investment property" is defined in § 148(b)(2)(D) to include "any investment-type property."

Through a critical, but unchallenged Treasury regulation, "investment-type property" includes "a prepayment for property or services . . . if a principal purpose for prepaying is to receive an investment return from the time the prepayment is made until the time payment otherwise would be made." Treas. Reg. § 1.148–1(b). The rulemaking notice proposing the prepayment regulation tells us almost nothing of its origins or of the problems it was meant to solve. 57 Fed.Reg. 53,046, 53,047 (1992). The private letter ruling in this case offered this brief explanation: "Prepayments contain a time value of money component, giving them a built-in investment return." Priv. Ltr. Rul. 95–09–035 (Mar. 3, 1995). As applied to the city and its prepayment, the explanation makes no sense. A prepayment can contain a time value of money component for the *payee*, but here the payee was the State Fund. As to payees or recipients of prepayments, the value to them lies in the adage: "A bird in the hand is worth two in the bush." In financial terms, cash today is worth more than cash in the future and investors would rather have the cash now so that they can increase its value over time. (Of course, other factors such as inflation and risk can decrease the value of money in the future.) *See Motion Picture Ass'n of America, Inc. v. Oman,* 969 F.2d 1154, 1157 (D.C.Cir.1992); Daniel I. Halperin, *Interest in Disguise: Taxing the "Time Value of Money,"* 95 YALE L.J. 506 (1986). Thus, the private letter ruling's observations about the time value of money and the purpose of the prepayment regulation are pertinent to the State Fund, but not to Columbus. The financial benefit to the city stemmed from the discount the State Fund gave it for paying its debt early.

At any rate, the IRS's theory on appeal is that by paying off its debt to the State Fund in 1994, Columbus acquired "investment-type property" within the meaning of this prepayment regulation (Treas. Reg. § 1.148–1(b)). The city's proposed bonds would be traced back to that 1994 transaction since the proceeds of those bonds would be used to pay off the city's short-term notes. One of the city's principal purposes for the 1994 transaction was to "receive an investment return"—namely, the difference between the 7.57484% "yield" resulting from the 35% discount the state offered, and the assumed "yield" of 6% on the city's proposed bonds. The city's 1994 satisfaction of its obligation to the state was, the IRS tells us, a "higher yielding investment," that is, an "investment property which produces a yield over the term of the issue which is materially higher than the yield on the issue." § 148(b)(1). (A spread of more than ⅛th of a percent is a "materially higher yield" under Treas. Reg.§ 1.148–2(d)(2).)

In the Tax Court, the city disputed this particular IRS theory on the basis that one cannot acquire "property" by satisfying one's own debt, which is how the city viewed the 1994 transaction and, hence, the consequences of its proposed bonds. The Tax Court acknowledged the city's argument but said it did not have to pass on it because the IRS's position could be supported on another ground: "The City Obligation represented the payment for the obligation of the State Fund in 1967 and we think that nexus remained extant at the time of the 1994 prepayment. In short, the source to which the prepayment applied was the acquisition of the obligation of the State Fund and controls the character of the transaction." Therefore, the court concluded, "the prepayment was for property and consequently we turn to the question whether it [the prepayment] was 'investment property.' "

The Tax Court's reasoning appears to be that Columbus acquired "property" in 1967 when the state took over the city's pension fund for police officers and firefighters. (We suppose the court thought this was the same

as if the city gone out and purchased an annuity, although the city did not voluntarily engage in the 1967 transaction.) And, the court held, the city acquired "property" again—this time "investment-type property" within Treas. Reg. § 1.148–1(b)—when it paid off its debt to the state in 1994. We shall assume the Tax Court is correct in viewing the 1967 transaction as one in which the city acquired "property." Even so, we cannot understand how the 1994 transaction constituted a **"prepayment"** for that 1967 "property." One would think "prepayment" signifies paying for property before receiving it. But the situation here is just the opposite. First the city received the property and then it began paying for it over time. Suppose, in 1967, the city had taken out a 20 year loan from a bank for the $42,687,799 and immediately turned the money over to the State Fund. If the city paid the bank ahead of time, no one would suppose the city thereby prepaid for its 1967 property. The city would be prepaying something else—its debt to the bank. We cannot see how this would constitute a "prepayment for property" unless settling one's debt before it falls due is acquiring property, the very question the Tax Court said it would not resolve.

The IRS's theory on appeal has the same reasoning gap. Of course the IRS is right that the 1994 transaction was financially beneficial to Columbus. And we may assume the IRS is also correct that maximizing that benefit by issuing tax-exempt bonds was "a principal purpose" of the city. *See Santa Fe Pacific Corp. v. Central States Pension Fund,* 22 F.3d 725, 727 (7th Cir.1994). We also have no doubt that the 1994 transaction was a "prepayment." But was the city's prepayment "for property"? Only if it was may the prepayment itself be treated as "investment-type property" under the regulation.[2] And so we are back to the same unanswered question—did the city, by retiring its debt to the state, prepay for "property"? What "property" could that be other than the city's obligation to the state? At argument, counsel for the IRS stated that the "acquisition" of one's indebtedness constitutes the acquisition of one's "property," but counsel failed to provide any support for this unusual view of the meaning of "property." The IRS's brief does not address the proposition.[3]

We will put this question aside. Still we must examine the consequences of treating the city's lump-sum payment in 1994, not as a "prepayment," but as the city's payment in full for the "property" it acquired in 1967. If the Tax Court is correct that the source to which the payment applies—acquisition of "property" in 1967—"controls the character of the transaction" in 1994, then the city's proposed bonds cannot be treated as arbitrage bonds. For one thing, the IRS has not contended that the city's 1967 property was of the "investment-type" under § 148(b) of the 1986 Code. For another thing, the relevant portion of § 148 of the 1986 Code could not be applied retroactively to the 1967 transaction. That transaction took place two years before the Code contained provisions

2. In order to be arbitrage bonds, the proceeds of the city's proposed bonds must also be used to acquire "higher yielding investments." § 148(a). This calls for a comparison. Treas. Reg. § 1.148–2 instructs one to compare "the *YIELD* on investments" with "the *YIELD* on the *ISSUE* to which the investments are allocated...." This is easy enough if a municipality purchases mortgage-backed securities yielding 8% (the "investments") by using the proceeds of bonds yielding 6% (the "issue"). Here the "investment," according to the IRS, is the city's prepayment of its obligation to the state. We understand why this "investment" gives rise to a savings, but it is scarcely clear how prepaying an obligation gives rise to a "yield." Fifteen years ago we thought "yield" had "a common and accepted meaning: it is the economic return on a debt instrument." *State of Washington,* 692 F.2d at 131. Matters may now have changed with the promulgation of Treas. Reg. § 1.148–5. We need not say more on the subject, however, because the city has not pressed the point.

3. The private letter ruling ducked the issue in this way:

> if the concept of a prepayment is limited ... to certain payments for property or services, then an issuer could avoid the arbitrage restrictions by, for example, contracting for the purchase of any item (e.g., property or services), agreeing to pay over time and then paying early to retire the debt.

Priv. Ltr. Rul. 95–09–035 (Mar. 3, 1995). Translation: the IRS may ignore the words of the Treasury's regulation—"prepayment for property or services"—if the words produce a result the IRS does not want.

barring tax-exempt status for interest on arbitrage bonds. *See* 1 BITTKER & LOKKEN, *supra*, ¶ 15.5.1. When Congress dealt with the subject in 1969, the provisions it added to the 1954 Code defined arbitrage bonds to mean any bond the proceeds of which are used to acquire "securities" or "obligations." *See State of Washington v. Commissioner*, 692 F.2d at 130. The 1986 Code replaced the quoted terms with "higher yielding investments," defined in § 148 to include "any investment-type property." A retroactivity rule was therefore needed. Rather than leave this to the IRS and the courts, Congress enacted § 1314(h) in the Technical and Miscellaneous Revenue Act of 1988:

> In the case of a bond issued before August 16, 1986 (September 1, 1986 in the case of a bond described in section 1312(c)(2)), section 103(c) of the 1954 Code shall be applied by treating the reference to securities in paragraph (2) thereof as including a reference to investment-type property but only for purposes of determining whether any bond issued after October 16, 1987, to advance refund such bond (or a bond which is part of a series of refundings of such bond) is an arbitrage bond (within the meaning of section 148(a) of the 1986 Code).

Pub.L. No. 100–647, § 1013(d)(3), 102 Stat. 3342, 3548.

The city claims that for purposes of § 1314(h), the relevant "bond issued before August 16, 1986" is its obligation to the State Fund incurred in 1967. "State or local bond" is defined in § 103(c)(1) of the 1986 Code as "an obligation of a State or political subdivision thereof." *See also* Treas. Reg.§ 1.150–1(b). Columbus's 1967 debt to Ohio seems to fit the bill. The IRS has chosen not to oppose the city's position on this subject, which is supported by other authority. *See* JOINT COMMITTEE ON TAXATION, GENERAL EXPLANATION OF THE TAX REFORM ACT OF 1986, at

1156 n.43 (1987) ("Under these rules, as under prior law, the term bond also includes debt obligations of a qualified governmental unit that do not involve the formal issuance of a bond or note."). The city's proposed bonds will "currently refund" the obligation in 1967.[4] The 1994 short-term notes could not serve to break this link. The "Transferred Proceeds Allocation Rule," Treas. Reg.§ 1.148–9(b)(1), provides that when the "proceeds of the refunding issue discharge any of the outstanding principal amount of the prior issue, proceeds of the prior issue become transferred proceeds of the refunding issue and cease to be proceeds of the prior issue." "Refunding issue" is defined as "an issue of obligations the proceeds of which are used to pay principal, interest, or redemption price on another issue . . . ." Treas. Reg. § 1.150–1(d). Here, the proceeds of the proposed bonds would be used to discharge the outstanding notes. The proposed bonds would thus be a refunding issue of the notes. The proceeds of the notes are allocated to the 1967 obligation, which they refunded. So the proposed bonds would currently refund the obligation. Under § 1314(h), the proposed bonds would therefore be a current refund of a pre-August 16, 1986, bond, to which the concept of "investment-type property" does not apply.

■ The IRS asks us to sustain the Tax Court's decision on an alternative ground not dependent on whether the city, in 1994, acquired investment-type property by prepaying its obligation to the state. The argument is that Treas. Reg. § 1.148–10(e), the "anti-abuse" regulation, permits the Commissioner "to depart from the technical provisions of the regulations to achieve a result in keeping with the economic substance of the transaction." Brief for Appellee at 31. But the anti-abuse regulation does not go so far. It conditions the Commissioner's exercise of this authority on the issuer's entering into a

---

**4.** Section 149(d)(5) provides that "a bond shall be treated as issued to advance refund another bond if it is issued more than 90 days before the redemption of the refunded bond." The distinction between a **current** refund bond and an **advance** refund bond is that a current refund bond is one that refunds a prior bond within 90 days of its issuance. *See* Treas. Reg. § 1.150–1(d)(3)

& (4). The city's 1994 short-term notes and each refinancing of them, including the proposed bonds, are "current refundings" and not "advance refundings," because the city did not (and will not) hold the proceeds for more than 90 days before using them to retire the earlier obligations.

transaction to obtain "a material financial advantage based on the difference between tax-exempt and taxable interest in a manner that is inconsistent with the purposes of section 148." Since we believe the Tax Court erred in treating the 1994 transaction as a prepayment for property the city acquired in 1967, and since this doubtless colored the court's view of what was, or was not inconsistent with the purposes of § 148, we cannot affirm the decision on the basis of the anti-abuse regulation. The purpose of § 148 is to prevent states and local governments from using tax-exempt bond proceeds to acquire higher yielding "investment property." Even if a "prepayment for property" may itself be investment property, it remains to be seen whether the City of Columbus, by satisfying its obligation to the State Fund in 1994, was making a "prepayment for property." Before the anti-abuse regulation is considered, that question must be resolved.

The judgment of the Tax Court is vacated and the case is remanded for further proceedings consistent with this opinion.

*Vacated and remanded.*